**In re POWERINE OIL CO., Debtor.**

**UIC, INC., Appellant,**

**v.**

**PLAINTIFF COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS OF POWERINE OIL CO., Appellee.**

BAP No. CC–90–1072–PVJ.

Bankruptcy No. LA 84–07086–JD.

Adv. No. LA 86–0994–JD.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued March 20, 1991.

Submitted April 4, 1991.

Decided April 30, 1991.

David B. Love, Chicago, Ill., for appellant.

Linda Blank, Los Angeles, Cal., for appellee.

Before PERRIS, VOLINN, and JONES, Bankruptcy Judges.

## OPINION

PERRIS, Bankruptcy Judge:

The appellee filed an adversary proceeding alleging that certain payments made to the appellant, UIC, Inc. ("UIC"),[1] within ninety days prior to the debtor's bankruptcy were preferential transfers under 11 U.S.C. § 547(b).[2] UIC contended that the payments were not preferential because they were payments in the ordinary course of business under section 547(c)(2). On cross-motions for summary judgment, the bankruptcy court determined that the payments were preferential and did not fall within the scope of section 547(c)(2). We AFFIRM the bankruptcy court's decision.

## FACTS

The debtor, Powerine Oil Co., is a California corporation engaged in the oil refining business. UIC is an Illinois corporation that manufactures and sells laboratory testing equipment. In the fall of 1983, the debtor discussed with UIC the purchase of certain laboratory testing equipment. UIC sent the debtor quotations for the equip-

---

**1.** UIC's predecessor in interest, Utopia Instrument Company, was the recipient of these transfers and was named as the defendant in the adversary proceeding. For purposes of convenience, both Utopia Instrument Company and UIC will be referred to as UIC.

**2.** All references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, unless the context otherwise indicates.

ment in November of 1983 stating the price for the equipment, including installation and on-site training of operator and service personnel, and terms, "Net 30 days after delivery," F.O.B. Joliet, Illinois. In December of 1983, the debtor submitted purchase orders for the equipment which also provided for payment terms of "net 30".

UIC shipped the equipment to the debtor in late December, 1983, and January, 1984. The debtor received shipments between January 3 and 23, 1984. UIC completed the installation of the equipment and training of the debtor's personnel on January 20, 1984.[3] After the debtor inspected and operated the equipment on a trial basis, it approved payment for the equipment on January 27 and February 13, 1984. The debtor paid for the equipment by delivering to UIC check number 362651, in the amount of $74,300.95 on February 27, 1984 and check number 362346, in the amount of $4,505.38, on March 16, 1984.[4]

More specifically, the shipment date, delivery date and payment information for the equipment reflected in the various invoices is set forth in the following table.

| Invoice Number | Amount | Shipping Date | Delivery Date | Payment Approval Date | Payment Delivery Date |
| --- | --- | --- | --- | --- | --- |
| A08647 | $61,750.00 | 12/30/83 | 1/03/84 | 1/27/84 | 2/27/84 |
| A08654 | $ 2,350.95 | 1/04/84 | 1/12/84 | 1/27/84 | 2/27/84 |
| A08659 | $10,200.00 | 1/05/84 | 1/09/84 | 1/27/84 | 2/27/84 |
| A08663 | $ 1,009.24 | 12/30/83 | 1/03/84 | 2/13/84 | 3/16/84 |
| A08692 | $ 140.64 | 1/05/84 | 1/09/84 | 2/13/84 | 3/16/84 |
| A08705 | $ 2,247.50 | 1/12/84 | 1/18/84 | 2/13/84 | 3/16/84 |
| A08733 | $ 13.00 | 1/18/84 | 1/20/84 | 2/13/84 | 3/16/84 |
| A08741 | $ 1,095.00 | 1/19/84 | 1/23/84 | 2/13/84 | 3/16/84 |

The debtor filed its Chapter 11 petition on March 26, 1984. On March 25, 1986, the appellee, the Committee of Creditors Holding Unsecured Claims ("the Committee"), filed this adversary proceeding alleging that the payments to UIC should be avoided as preferential transfers under section 547(b).[5] UIC asserted that the payments were made in the ordinary course of business under section 547(c)(2) and therefore should not be avoided. On cross motions for summary judgment, the bankruptcy court determined that the payments did not fall within the scope of section 547(c)(2) and therefore granted summary judgment in favor of the committee. UIC filed this timely appeal.

DISCUSSION

The primary issue on this appeal is whether the payments fall within the scope of section 547(c)(2). Determining this issue involves the consideration of two sub-issues:

1. Whether the payments were made more than 45 days after the debts were incurred.

2. Whether the payments were made in the ordinary course of business of the debtor and UIC.

Because the bankruptcy court decided these issues on cross motions for summary judgment, we conduct de novo review.

**3.** There appears to be some inconsistency between the fact that UIC completed installation and training on January 20, 1984 and the fact that the debtor did not receive the final shipment until January 23, 1984. The record is clear in this regard, however, and in any event, this discrepancy is not pertinent to the issues raised on appeal.

**4.** The debtor issued check number 362651 on February 2, 1984, but did not mail the check to UIC until February 22, 1984. Similarly, the debtor issued check number 363246 on February 16, 1984, but did not mail it to UIC until March 12, 1984.

**5.** The bankruptcy court designated the Committee as the representative of the estate to pursue preference actions on behalf of the estate.

See, e.g., In re United Energy Corp., 102 B.R. 757, 760 (9th Cir. BAP 1989).

The parties do not dispute that the Committee has established the elements of a preference under section 547(b). Rather, the parties dispute whether the payments fall within the exception of section 547(c)(2). Prior to the 1984 amendments to the Bankruptcy Code,[6] section 547(c)(2) provided that a trustee could not avoid a transfer under section 547 to the extent the transfer was:

> (A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;
>
> (B) made not later than 45 days after such debt was incurred;
>
> (C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (D) made according to ordinary business terms.

The focus of this appeal is on the section 547(c)(2)(B) and 547(c)(2)(C).

1. *Whether the payments were made more than 45 days after the debts were incurred.*

■ The payments at issue were made upon the delivery of the checks to UIC on February 27 and March 16, 1984. The primary issue on appeal concerns whether the debtor incurred the debt: (1) upon the delivery of the various shipments, in which case the debt was incurred more than 45 days prior to payment;[7] (2) upon UIC's completion of the installation of the equipment, in which case the February 27 payment in the amount of $74,300.95 would be within 45 days but the March 16 payment of $4,505.38 would not;[8] or (3) upon the debtor's approval of payment on January 27 and February 13, 1984, in which case all payments would be made within the 45 day period.[9]

The Bankruptcy Code defines the term "claim," and coextensively the term "debt," in the broadest possible manner to include all legal obligations of the debtor, no matter how remote or contingent. *See* sections 101(4) and 101(11); House Report No. 95–595, 95th Cong. 1st Sess. 309–310 (1977); Senate Report No. 95–989, 95th Cong. 2d.Sess. 21–23 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5807–09, 6266, 6267. Although the Code does not define when a debt is incurred, case law establishes that a debt is incurred, for purposes of the 45 day limitation of section 547(c)(2), when the debtor becomes legally obligated to pay. *See, e.g., In re Gold Coast Seed Co.,* 751 F.2d 1118, 1119 (9th Cir.1985).

The Committee contends, and the bankruptcy court implicitly determined, that the debtor incurred the debts at issue upon delivery of the equipment. The Committee relies upon the broad definition of the term "debt," upon bankruptcy case authority determining that a debt for goods arose upon the shipment or delivery of those goods, *see, e.g. Gold Coast Seed, supra; In re Georgia Steel, Inc.,* 56 B.R. 509, 518 (Bankr.M.D.Ga.1985), *rev'd on other grounds,* 66 B.R. 932 (M.D.Ga.1986), upon the principle that a debt is incurred when the debtor obtains a property interest in the consideration giving rise to the debt, *see Barash v. Public Finance Corp.,* 658 F.2d 504, 509 (7th Cir.1981), and upon the terms of the contract which provided payment terms "net 30 days after delivery" and which passed title to the equipment upon UIC's delivery of the equipment to the carrier.

6. Because the debtor filed its bankruptcy case prior to October 8, 1984, the effective date of the 1984 amendments, this proceeding is governed by the Code as it existed prior to the amendments.

7. UIC delivered the equipment paid for by the February 27 payment on January 3, January 9, and January 12, 1984. The payment was between 46 and 55 days after delivery.

8. UIC completed the installation of the equipment on January 20, 1984. The February 27 payment was made 38 days later and the March 16 payment was made 56 days after the completion of installation.

9. The February 27 payment was 31 days after the January 27, 1984 approval of payment for the invoices represented by that payment. The March 16 payment was 32 days after the February 13 approval of payment for the invoices represented by that payment.

UIC contends that the debtor did not incur the debt until it accepted the equipment, which occurred upon the debtor's approval of payment for the equipment after the debtor had an opportunity to inspect the installed equipment. UIC relies upon the Uniform Commercial Code and authorities thereunder which indicate that the buyer's act of acceptance triggers its obligation to pay the contractual price for the goods. Alternatively, UIC contends that the earliest date upon which the debtor became legally obligated to pay for the goods was when UIC completed its installation of the equipment and training of the debtor's personnel because that is when UIC completed the essential elements of its obligations in the transaction.

Many authorities indicate that a debt is incurred for purposes of section 547(c)(2)(B) upon the shipment or delivery of the goods, depending upon the contract terms. *See, e.g., Gold Coast Seed,* 751 F.2d at 1118; *In re Almarc Manufacturing, Inc.,* 52 B.R. 582, 585 (Bankr.N.D.Ill.1985); *but see, e.g., In re Caceres Johnson P.R., Inc.,* 91 B.R. 200, 203 (D.P.R.1988) (indicating that the obligation to pay does not arise until the debtor accepts the goods). None of these cases, however, addressed the precise issue before us—a choice between delivery or shipment of the goods, on the one hand, and acceptance of the goods, on the other hand. For example, in *Gold Coast Seed,* the court determined whether the debtor became legally bound to pay upon shipment or delivery or upon the earlier execution of the contract to purchase the goods. *Almarc Manufacturing,* 52 B.R. at 585, indicated that the debt is incurred upon shipment or delivery rather than the date of invoicing or the date payment is due. *See, e.g., In re Demetralis,* 57 B.R. 278, 284 (Bankr.N.D.Ill.1986). In *Caceres Johnson,* the court noted that the trustee did not contend that the debtor became obligated to pay at any point prior to acceptance.[10]

Although none of these cases directly addressed the issue before us, these authorities do provide useful guidance for

resolving this issue. *Gold Coast Seed* looked to the terms of the contract and state law, as well as when the creditor provided the goods, services or performance required of it under the contract, to determine when the debtor's obligation arose. Any reliance upon state law, however, should be tempered by the Code's broad definition of debt. In addition, other bankruptcy authorities indicate that a debtor first becomes obligated to pay when it obtains a property interest in the consideration exchanged giving rise to the debt. *E.g., In re C.H.G. International, Inc.,* 897 F.2d 1479, 1486 (9th Cir.1990); *Barash v. Public Finance Corp.,* 658 F.2d 504 (7th Cir.1981).

The payment terms of the contract at issue are most completely set forth in the price quotations which provide for "Terms: Net 30 days after delivery." Because delivery is the event from which the timeliness of the debtor's payment will be measured, it follows that under the language of the parties' agreement, delivery is the event which triggers the debtor's obligation to pay and caused the debtor to incur the debt.

The price quotations and purchase orders also provide that the delivery terms will be "F.O.B. shipping point, Joliet, Illinois." Under this contract term and Uniform Commercial Code §§ 2–319(1)(a) and 2–401(2)(a), the title to the equipment passed to the debtor at the time of shipment in Illinois, or at the very latest, upon delivery to the debtor in California. *See* U.C.C. § 2–401(2). The debtor acquired a property interest in the equipment, therefore, at that time and under *C.H.G. International* and *Barash, supra,* the debtor became obligated to pay and incurred the debt at that time.

UIC relies upon U.C.C. §§ 2–607(1) to contend that the debtor's obligation to pay did not arise until it accepted the equipment. Section 2–607(1) provides that the buyer must pay at the contract rate for any

---

**10.** In addition, in *Caceres Johnson,* the debtor's receipt and acceptance of the goods occurred

contemporaneously.

goods accepted and UIC is correct that U.C.C. §§ 2–513(1) and 2–601(1) require an opportunity to inspect the goods before any obligation to accept or reject the goods. Although the implication of section 2–607(1) is that the buyer may not be obligated to pay the contract price prior to acceptance, this does not mean that the debtor did not incur any debt to UIC prior to the acceptance of the delivered goods. First, we find no authorities indicating that a buyer bears no obligation to the seller during the period after the seller delivers conforming goods but before acceptance. The cases cited by UIC do not deal with a buyer's obligation during this period of time prior to acceptance; rather they deal with whether the buyer should be liable for the contract price after the buyer either accepted or rejected the goods. *See, e.g. Van Dorn Co. v. Future Chemical & Oil Corp.*, 753 F.2d 565, 574 (7th Cir.1985). In addition, the contract between the parties may require payment prior to acceptance or inspection of the goods. *See Tonka Tours, Inc. v. Chadima*, 372 N.W.2d 723, 727, 42 UCC Rep.Serv. 430, 434 (Minn. 1985). In such an event, acceptance will not necessarily be a pre-condition to the debtor's obligation to pay; rather, rejection or a failure to accept may be an event which extinguishes the existing obligation. By setting forth payment terms of 30 days from delivery, the parties in this case arguably required payment prior to acceptance.

Most importantly, the position advanced by UIC is inconsistent with the Code's broad definition of debt and claim. A debt means liability on a claim. Section 101(11). A claim means any right to payment or right to an equitable remedy for breach of performance, whether or not such right is fixed, contingent, matured, unmatured, disputed or undisputed. Section 101(4). Although UIC makes much of the fact that the debtor had the right to inspect the equipment to determine whether the equipment conformed to the contract, there is no contention that the goods were non-conforming.[11] Upon the receipt of conforming goods, UIC was entitled to acceptance of

the equipment and payment. UIC's right to payment certainly falls within the definition of claim and the debtor's corresponding liability would be a debt. Even if the Panel considers the issue of conformity at the time of delivery as an open question, as UIC contends, the debtor was obligated to either accept and pay or to reject and hold the goods for UIC if the equipment did not conform. *See* U.C.C. §§ 2–601 and 2–602. UIC had a right to payment if the equipment was accepted or, in the alternative, a right to compel performance if the equipment was nonconforming and rejected. Although these rights may have been contingent or unmatured prior to any acceptance, in either event, UIC had a claim against the debtor and the debtor owed a debt to UIC upon the debtor's receipt of the equipment.

UIC's contention that the debt did not arise until it completed installation and training fails for the same reason. Although UIC's performance of its contractual obligation was not complete until it completed installation and training, as discussed above, the debtor acquired title to the equipment, at the very latest, when it received the equipment and UIC acquired a contingent right to either payment or performance at that time. If the debtor had filed bankruptcy after it received the equipment but before UIC completed installation, UIC would certainly be able to assert a claim against the estate. It follows that UIC had a claim and the debtor owed a corresponding debt that arose upon the debtor's receipt of the equipment. For this reason, the bankruptcy court correctly concluded that the payments were made more than 45 days after the debtor incurred its debt.

2. *Whether the payments were made in the ordinary course of business of the debtor and UIC.*

■ As an alternative ground for affirming the bankruptcy court, we also determine that the bankruptcy court correctly concluded that the payments were not made in the ordinary course of business of

---

**11.** In essence, UIC injects a hypothetical possibility of non-conformity to bootstrap its way into an argument that the debtor did not become obligated to pay until a later time.

UIC and the debtor under section 547(c)(2)(C). A transfer is made in the ordinary course of business if it is proved to be within the prior course of business of the debtor and the transferee. *See In re Loretto Winery Ltd.*, 107 B.R. 707, 709 (9th Cir. BAP 1989). Factors courts consider in determining whether a payment is in the ordinary course of business include whether the payment arises out of unusual debt collection or payment practices, *see In re Pioneer Technology, Inc.*, 107 B.R. 698, 702 (9th Cir. BAP 1988), and whether the payment is late. *See In re Xonics Imaging, Inc.*, 837 F.2d 763, 766–67 (7th Cir. 1988). While failure to make payments within the time required by the contract creates a rebuttable presumption that the payment is non-ordinary, *id.*, late payments can be within the ordinary course of business if they are a few days late and follow the prior practice between the parties. *In re Gaildeen Industries, Inc.*, 71 B.R. 759, 766 (9th Cir. BAP 1987).

In this case the Committee contends and the bankruptcy court determined that the payment was not in the ordinary course of business of the debtor and UIC because the payments were late in that they were made more than 30 days after delivery, as was required in the contract. UIC contends that the payments were not late because its standard policy was to require payment within 30 days after the buyer approved the invoices for payment and that payment was made upon the mailing of the checks, which occurred within 30 days after approval.[12]

UIC's contentions are without merit. The price quotations establish that the debtor was given 30 days from delivery to pay. UIC's evidence that its standard practice was to begin the 30 day payment period upon the approval of the invoice should not be used to contradict the clear contract terms. In addition, even if the 30 day period did begin upon approval, as a matter of law and contrary to UIC's contentions, a transfer by check is made when the check is delivered to the transferee, provided it is honored within a reasonable time. *See In re Wolf & Vine*, 825 F.2d 197 (9th Cir. 1987). The checks at issue were not delivered to UIC until more than 30 days after approval of payment. The debtor failed to make the payments within the time period required by the contract and the payments were presumptively outside the ordinary course of business. Given the absence of evidence that the late payments followed the prior practice of the parties and given the fact that the debtor, because of its precarious financial condition, held the checks for approximately three weeks after they were issued, the bankruptcy court correctly determined that the payments were not in the ordinary course of business.

## CONCLUSION

The bankruptcy court correctly concluded that the payments were made more than 45 days after the debtor incurred the debt to UIC, that the payments were not in the ordinary course of business and that UIC did not establish its defense to the preference action under section 547(c)(2). Accordingly, we AFFIRM the bankruptcy court's decision.

---

12. UIC bases this argument on the ordinary business terms element. The ordinary business term element of section 547(c)(2)(C), however, requires proof that the challenged transfer was made pursuant to an objective standard based on practices common to businesses similarly situated to the debtor and the transferee. *Loretto Winery*, 107 B.R. at 709. The substance of UIC's argument addresses the more subjective ordinary course of business element rather than the objective ordinary business term element. Treatment of this issue under the ordinary course of business element is also consistent with the bankruptcy court's findings.