### In re BRANIFF, INC., Debtor.

### BRANIFF, INC., Plaintiff,

### v.

### SUNDSTRAND DATA CONTROL, INC., Defendant.

**Bankruptcy No. 89–03325–6C1.
Adv. No. 91–344.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

April 8, 1993.

---

**14.** *Finley, Kumble,* 149 B.R. at 368.

Earl M. Forte III, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for Braniff, Inc.

Eugene J. Geekie, Schiff, Hardin & Waite, Chicago, IL, Robert L. Young, Carlton, Fields, Ward, Emmanuel Smith & Cutler, P.A., Orlando, FL, for defendant, Sundstrand Data Control, Inc.

Richard Levy, Jr., Varet, Marcus & Fink, P.C., New York, NY, for official committee of unsecured creditors.

Mark Bonacquisti, McDermott, Will & Emery, Miami, FL, for official committee of note holders.

C. TIMOTHY CORCORAN, III, Bankruptcy Judge.

### PARTIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

This adversary proceeding is an action by the debtor, plaintiff, Braniff, Inc. ("Braniff"), for the recovery of preferential transfers from defendant, Sundstrand Data Control, Inc. ("Sundstrand"), pursuant to 11 U.S.C. § 547.

On December 2 and 3, 1992, the court tried all issues in the proceeding except the issue of the debtor's solvency. The court has severed that issue for a separate trial in the master *Braniff Insolvency Litigation.* These findings of fact and conclusions of law, entered pursuant to F.R.B.P. 7052, therefore address all issues except solvency. Pursuant to F.R.B.P. 9021, the court will enter judgment only after the making of findings and conclusions is completed following trial of the solvency issue.

### FINDINGS OF FACT

1. Braniff filed for relief under Chapter 11 of the United States Bankruptcy Code of 1978, as amended (the "Bankruptcy Code"), at 1:35 a.m. on September 28, 1989 (the "petition date"). Since the petition date, Braniff has remained in possession of its assets and business as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

2. In this adversary proceeding, Braniff seeks to recover from Sundstrand preferential transfers made by Braniff during the 90–day period immediately preceding the petition date (the "preference period"). The preference period began on June 30, 1989, and ended on September 28, 1989.

3. The issue of Braniff's insolvency during the preference period has been severed by the court from this and numerous other adversary proceedings and consolidated into a single adversary proceeding entitled *Braniff Insolvency Litigation,* Master Adversary Proceeding Number 92–911 (the "BIL"). Hence, the issue of Braniff's insolvency during the preference period for purposes of 11 U.S.C. § 547(b)(3), was not at issue at the trial of December 2 and 3, 1992 in this adversary proceeding, but will be decided in the BIL at a later time. Both Braniff and Sundstrand have reserved their rights in connection with the insolvency issue.

4. Sundstrand has a place of business located at 15001 N.E. 36th Street, P.O. Box 97001, Redmond, Washington 98073–9701, and is a corporation organized under the laws of the State of Delaware. Sundstrand is in the business of providing Universal Flight Data Recorders ("UFDRs"), Ground Proximity Warning Computers ("GPWCs"), and maintenance services to its customers such as Braniff.

5. Before the petition date, Sundstrand provided Braniff with UFDRs, GPWCs and

related maintenance services for Braniff's aircraft, including the Airbus A320 aircraft to be acquired by Braniff. *See Braniff, Inc. v. GPA Group plc, etc., et al. (In re: Braniff, Inc.)*, 118 B.R. 819, 828 (Bankr. M.D.Fla.1989). After providing such equipment and services to Braniff, Sundstrand invoiced Braniff on payment terms of "net 30 days", as set forth in all Sundstrand's invoices to Braniff.

6. The parties stipulated before trial that during the preference period, Braniff made four transfers to Sundstrand, all by check, totalling $480,560.23, exclusive of interest and costs. These transfers were in payment of nine invoices from Sundstrand to Braniff during the preference period.

This stipulation by the parties was in fact borne out by the trial evidence.

7. Before the preference period Braniff made two transfers, both by check, to Sundstrand totaling $64,207.00. These transfers were in payment of four invoices from Sundstrand to Braniff during the pre-preference period.

8. Based upon the testimony and other evidence presented at trial, notably Braniff's Trial Exhibits 3 and related testimony from both Braniff and Sundstrand, a schedule of all invoices and transfers (although not a full trading history) between Braniff and Sundstrand both before and during the preference period, as well as certain other information, is set forth below in the following chart:

PAYMENT HISTORY BETWEEN BRANIFF AND SUNDSTRAND MARCH 1989–SEPTEMBER 1989

| INVOICE DATE | INVOICE NUMBER | CHECK NUMBER | INVOICE AMOUNT | CHECK AMOUNT | DATE CHECK ISSUED | DATE CHECK CLEARED | (1) NUMBER OF DAYS ELAPSED | (2) NUMBER OF ELAPSED DAYS |
|---|---|---|---|---|---|---|---|---|
| PRE–PREFERENCE | | | | | | | | |
| 01/30/89 | A90754 | 22128 | $19,426.00 | $63,074.00 | 03/17/89 | 03/28/89 | 57 | 11 |
| 02/01/89 | A90875 | 22128 | $24,222.00 | " | 03/17/89 | 08/28/89 | 55 | 11 |
| 02/07/89 | A97031 | 22128 | $19,426.00 | " | 03/17/89 | 03/28/89 | 49 | 11 |
| 02/13/89 | 1155 | 24305 | $1,133.00 | $1,133.00 | 04/05/89 | 04/10/89 | 55 | 5 |
| | | | $64,207.00 | $64,207.00 | | | | |
| PREFERENCE PERIOD | | | | | | | | |
| 03/27/89 | A92207 | 58690 | $21,740.00 | $392,088.64 | 06/30/89 | 07/21/89 | 116 | 21 |
| 04/03/89 | A92345 | 58690 | $21,740.00 | " | 06/30/89 | 07/21/89 | 109 | 21 |
| 05/05/89 | A93262 | 58690 | $152,516.23 | " | 06/30/89 | 07/21/89 | 77 | 21 |
| 05/22/89 | A93575 | 58690 | $196,092.36 | " | 06/30/89 | 07/21/89 | 60 | 21 |
| 05/23/89 | AR3521 | 61752 | $375.00 | $750.00 | 07/25/89 | 08/22/89 | 91 | 28 |
| 06/22/89 | AR4157 | 61752 | $375.00 | $750.00 | 07/25/89 | 08/22/89 | 61 | 28 |
| 07/27/89 | A95404 | 65885 | $48,444.00 | $87,346.59 | 07/31/89 | 08/28/89 | 32 | 28 |
| 07/27/89 | A95404 | 65885 | $38,902.59 | " | 07/31/89 | 08/28/89 | 32 | 28 |
| 07/31/89 | AR4989 | 71101 | $375.00 | $375.00 | 08/30/89 | 09/08/89 | 39 | 9 |
| | | | $480,560.23 | $480,560.23 | | | | |
| UNPAID INVOICES | | | | | | | | |
| 08/09/89 | 5137 | N/A | $461.00 | N/A | N/A | N/A | N/A | N/A |
| 08/18/89 | AR5330 | N/A | $1,960.00 | N/A | N/A | N/A | N/A | N/A |
| 08/28/89 | AR5533 | N/A | $1,960.00 | N/A | N/A | N/A | N/A | N/A |
| 09/01/89 | A96287 | N/A | $77,746.00 | N/A | N/A | N/A | N/A | N/A |
| 09/01/89 | AR5641 | N/A | $1,960.00 | N/A | N/A | N/A | N/A | N/A |
| 09/06/89 | AR5681 | N/A | $375.00 | N/A | N/A | N/A | N/A | N/A |
| 09/11/89 | AR5704 | N/A | $1,499.00 | N/A | N/A | N/A | N/A | N/A |
| 09/20/89 | AR6146 | N/A | $2,544.00 | N/A | N/A | N/A | N/A | N/A |
| | | | $88,505.00 | | | | | |

(1) Elapsed days between invoice date and date check cleared Braniff's bank account.
(2) Elapsed days between check issue date and date check cleared Braniff's bank account.
PRE–PREFERENCE PERIOD

The average elapsed days between the date of the invoice and the date the check cleared Braniff's bank account was 54.25 days. With a range from 49 to 57 days.
The average elapsed days between the date the check was issued and the date the check cleared Braniff's bank account was 8.0 days. With a range from 5 to 11 days.

The average elapsed days between the date of the invoice and the date the check cleared Braniff's bank account was 68.5 days. With a range from 32 to 116 days.
The average elapsed days between the date the check was issued and the date the check cleared Braniff's bank account was 21.5 days. With a range from 9 to 28 days.

---

9. The Pre-trial Stipulation filed by the parties, and the testimony and other evidence presented at trial, show that Braniff's check nos. 58690 (in the amount of $392,088.64), 61752 (in the amount of $750.00), 65885 (in the amount of $87,-346.59) and 71101 (in the amount of $375.00) listed above, were all transfers made by Braniff to Sundstrand during the preference period. This finding is supported by the fact that all these checks cleared Braniff's bank account between June 30 and September 28, 1989.

10. As set forth in the parties' Pre-trial Stipulation, and as shown by the evidence at trial, the four transfers made by Braniff to Sundstrand during the preference period, and listed above, were transfers of Braniff's property to or for the benefit of Sundstrand.

11. The four checks issued by Braniff to Sundstrand during the preference period were in payment of nine invoices from Sundstrand, nos. A92207, A92345, A93262, A93575, AR3521, AR4157, A95404, A95405 and AR4989. Because each one of these invoices is dated earlier than the clear date for each of the four checks that paid them, the four checks issued by Braniff to Sundstrand during the preference period constitute transfers for or on account of antecedent debt owed by Braniff to Sundstrand at the time each transfer was made.

12. As presented by Braniff through the testimony of David R. Murchison, Braniff's Chief Executive Officer, the court confirmed Braniff's Liquidating Plan (the "Plan") on July 23, 1992. Based on the terms of the Plan and the financial condition of Braniff, there is no scenario under which general unsecured creditors of Braniff such as Sundstrand will receive 100 cents on the dollar on their Proofs of Claim or scheduled amounts. Rather, general unsecured creditors such as Sundstrand will receive substantially less than 100 cents on the dollar.

13. During the preference period Sundstrand made subsequent advances to Braniff. These subsequent advances totalled $175,851.59. Of these subsequent advances by Sundstrand, $88,505.00 remain unpaid as of the petition date.[1] Sundstrand has filed a general unsecured Proof of Claim against Braniff's estate in the amount of $88,505.00.

14. The payment terms on all of Sundstrand's invoices to Braniff were "net 30 days". The evidence shows that this meant that payment was due to Sundstrand by Braniff within thirty calendar days after the date on each invoice. No evidence was presented showing that these written payment terms were ever modified by the parties.

15. All payments made by Braniff to Sundstrand, both before and during the preference period, were made outside the written invoice payment terms of "net 30 days" and were therefore late payments.

16. As set forth in the chart above, the average number of days between the date on Sundstrand's invoices to Braniff and the date Braniff's checks for payment of those

---

1. Although the parties agree on the total amount of subsequent advances made by Sundstrand to Braniff during the preference period, they dispute the extent to which Sundstrand may receive "new value" credit for these subsequent advances for purposes of Sundstrand's "new value" defense under 11 U.S.C. § 547(c)(4). Braniff asserts that Sundstrand may receive "new value" credit only to the extent of $88,505.00, while Sundstrand asserts that it may receive new value credit to the extent of $175,851.59. The Court will resolve this legal dispute in its conclusions of law set forth below.

invoices cleared Braniff's bank, was 54.25 days before the preference period and 68.5 days during the preference period.

17. As shown by the chart set forth above, during the preference period, after Braniff issued checks to Sundstrand, Braniff would hold those checks for significant periods of time before releasing them to Sundstrand. The trial testimony shows that this practice of check holding was engaged in by Braniff due to cash flow problems that Braniff was experiencing during the preference period. The evidence also shows that the average number of days between the check issue date and the check clear date on Braniff's checks to Sundstrand increased from 8.0 days before the preference period to 21.5 days during the preference period. As set forth in the above chart, check number 58690 was held for 21 days, check no. 61752 was held for 28 days, check no. 65885 was held for 28 days, and check no. 71101 was held for 9 days, as evidenced by the time that elapsed between the check issue date and the check clear date.

18. Invoice nos. A92207, A92345, A93262 and A93575 listed above, were originally sent to Dalfort Corporation ("Dalfort") at the time they were released by Sundstrand. Sundstrand presented evidence that these four invoices were received by Braniff on June 14, 1989, by facsimile transmission. Through this evidence Sundstrand attempted to argue that because these invoices were "re-issued" to Braniff on June 14, 1989, Braniff's payment of these invoices by check no. 58690, approximately 36 days thereafter, was timely. On the other hand, evidence was also presented at trial that Sundstrand's invoices to Braniff were routinely sent to Dalfort, that Dalfort and Braniff had at one time shared the same business address and certain physical facilities, and that it was routine for Braniff invoices to be sent to Dalfort and either paid by Dalfort or directed to Braniff for payment. In addition, the invoices themselves show that they were issued by Sundstrand on March 22, 1989, March 29, 1989, May 4, 1989 and May 18, 1989, respectively. Viewing the evidence as a whole, Sundstrand has not proven by a preponderance of the evidence that Braniff did not receive invoice nos. A92207, A92345, A93262 and A93575 before June 14, 1989. Rather, it is just as reasonable for the court to conclude from the evidence that Braniff received the four invoices near the time they were originally issued by Sundstrand, in accordance with the parties' routine practice.

19. During the preference period Sundstrand established a new account for Braniff and Braniff treated certain large invoices from Sundstrand (nos. A92207, A92345, A93262 and A93575) as part of Braniff's capital budget. This had not occurred before the preference period.

20. The evidence at trial shows that check number 58690 in the amount of $392,088.64 from Braniff to Sundstrand was paid to Sundstrand as a result of certain debt collection efforts by Sundstrand during the preference period. Braniff's Trial Exhibit 52, a letter dated July 18, 1989 from Sundstrand to Braniff, threatened to cancel shipment of important equipment for installation in the A–320 aircraft Braniff had on order from Airbus if Braniff did not pay all past due amounts to Sundstrand. The court is unpersuaded by the evidence presented at trial by Sundstrand that Cristy Tuazon, the signatory of Braniff's Trial Exhibit 52, lacked authority to send that letter to Braniff.

21. The evidence shows that check number 56885 in the amount of $87,346.59 from Braniff to Sundstrand was also paid as a result of certain debt collection efforts by Sundstrand during the preference period. As evidenced by Braniff's Trial Exhibits 53 through 56, and the accompanying testimony of Ms. Heather K. Wyman, Braniff's Chief Financial Officer, Sundstrand threatened to cut off shipments to Aerospatiale (an affiliate of Airbus Industrie, G.I.E., the manufacturer of the A320s) if Braniff did not bring its outstanding credit line of $80,-000.00 current with Sundstrand.

22. No evidence was presented by Sundstrand from which the court could conclude that any unusual debt collection efforts occurred before the preference period

or that it was in the ordinary course of the parties' business to engage in such debt collection practices.

## CONCLUSIONS OF LAW

### A. *Issues Presented*

23. With the exception of the "chapter 7" element set forth in 11 U.S.C. § 547(b)(5), and the insolvency issue of 11 U.S.C. § 547(b)(3), the parties stipulated before trial that Braniff had satisfied the requirements of a *prima facie* case of preferential transfers against Sundstrand, pursuant to 11 U.S.C. § 547(b). The parties also stipulated that the payments at issue were for debts incurred in the ordinary course of financial affairs of Braniff and Sundstrand for purposes of 11 U.S.C. § 547(c)(2)(A). Based on these pre-trial stipulations, the written submissions by the parties, the statements of counsel in open court at the commencement of trial, and the evidence presented, the legal issues presented at trial in this adversary proceeding were as follows:

i. Whether receipt of the transfers in question enabled Sundstrand to receive more than it would receive if this case were a case under chapter 7 of the Bankruptcy Code, if the transfers had not been made and if Sundstrand received payment on the debts in question to the extent provided by the provisions of the Bankruptcy Code, for purposes of 11 U.S.C. § 547(b)(5);

ii. Whether the transfers made by Braniff to Sundstrand during the preference period, were made in the ordinary course of business or financial affairs of Braniff and Sundstrand, for purposes of 11 U.S.C. § 547(c)(2)(B);

iii. Whether the transfers made by Braniff to Sundstrand during the preference period, were made according to ordinary business terms between Braniff and Sundstrand for purposes of 11 U.S.C. § 547(c)(2)(C); and

iv. Whether after Braniff made preferential payments to Sundstrand, Sundstrand made subsequent advances for new value to Braniff totalling $88,505.00, as alleged by Braniff, or totalling $175,-851.59, as alleged by Sundstrand for purposes of 11 U.S.C. § 547(c)(4).

### B. *The "Chapter 7" Element*

24. Section 547(b)(5) of the Bankruptcy Code states:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

... (5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

■ 25. As stated above, Mr. Murchison testified for Braniff that the court confirmed the Plan on July 23, 1992, and that there is no scenario under which general unsecured creditors such as Sundstrand will receive 100 cents on the dollar on their Proofs of Claim or scheduled amounts. Mr. Murchison also testified that general unsecured creditors such as Sundstrand will receive substantially less than 100 cents on the dollar. No countervailing evidence was offered by Sundstrand on this point.

26. In light of Mr. Murchison's testimony, and the other evidence showing that Sundstrand was paid 100 cents on the dollar for the nine invoices paid by Braniff during the preference period, the court concludes that Braniff has satisfied the requirements of 11 U.S.C. § 547(b)(5).

27. Therefore, with the exception of the insolvency issue of 11 U.S.C. § 547(b)(3), which the court severed from this adversary proceeding, Braniff has established a *prima facie* case for preferential transfers against Sundstrand pursuant to 11 U.S.C. § 547(b) for all four transfers by check made by Braniff to Sundstrand during the preference period.

### C. The Ordinary Course Of Business Defense

28. The ordinary course of business defense is set forth at 11 U.S.C. § 547(c)(2), and states that:

(c) The trustee may not avoid under this section a transfer— ...

(2) To the extent that such transfer was—

(A) In payment of a debt incurred by the debtor in the ordinary course of business of financial affairs of the debtor and the transferee; [2]

(B) Made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) Made according to ordinary business terms;

29. The analysis of this exception to the trustee's avoidance powers is based upon the circumstances of the business transactions between the parties, not the standard in the industry. *In re Industrial Supply Corp.*, 127 B.R. 62, 65 (M.D.Fla.1991); *Braniff, Inc. v. Aircraft Tooling, Inc. (In re Braniff, Inc.),* Adversary Proceeding No. 91–318, at 8 (Bankr. M.D.Fla.1992, Henry H. Dickinson J.) ("The focus of this [ordinary course of business] analysis must center on the particulars of the specific relationship between the debtor and the preference defendant and not on generally prevailing industry practices"). Moreover, the ordinary course of business exception to the trustee's avoiding powers should be narrowly interpreted. *In re Industrial Supply Corp., supra* 127 B.R. at 65.

30. The factors to be considered by the court in determining whether payments are protected from avoidance under § 547(c)(2) are: (1) the prior course of dealing between the parties; (2) the amount of the payments; (3) the timing of the payments; and (4) the circumstances surrounding the payments. *In re Industrial Supply Corporation,* 109 B.R. 484, 489 (Bankr. M.D.Fla.1990). This three-prong test, originally articulated in *In re Johns–Manville Corp.*, 60 B.R. 612 (Bankr.S.D.N.Y.1986), is

commonly known as the "vertical test". *In re Industrial Supply supra* 109 B.R. at 488. ("[T]he primary focus of the vertical dimension [test] is ... on the debtor's internal operation and workings. Basically, this test requires an analysis of the Debtor's transactions with a particular creditor and whether the circumstances of those transactions have undergone any changes (citations omitted)"). *In re Industrial Supply Corp., supra* 109 B.R. at 488–489, *aff'd,* 127 B.R. 62, 64–65 (M.D.Fla.1991); *see also In re Homes of Port Charlotte, Florida, Inc.,* 109 B.R. 489, 491 (Bankr.M.D.Fla. 1990). As with all defenses under § 547(c), the defendant has the burden of proving the ordinary course of business defense by a preponderance of the evidence. 11 U.S.C. § 547(g); *In re Industrial Supply Corporation, supra* 127 B.R. at 65.

#### 1. Lateness

31. The evidence shows that all four payments made by Braniff to Sundstrand during the preference period were late, because all were made outside Sundstrand's written invoice terms of "net 30 days" and as measured by the parties' conduct. As noted by the Eleventh Circuit Court of Appeals in *In re Craig Oil Co.,* 785 F.2d 1563, 1567–1568 (11th Cir.1986):

Lateness is particularly relevant in determining whether payments should be protected by the ordinary course of business exception ... Since the foundation of this provision is the similarity of trade credit and current expenses the scope of its protection is necessarily limited to trade credit which is "kept current" or other transactions which are paid in full within the initial billing cycle. Thus, untimely payments are more likely to be considered outside the ordinary course of business and avoidable as preferences.

*See also In re Gold and Coast Seed Company,* 24 B.R. 595, 597 (9th Cir.B.A.P.1982); *In re Fred Hawes Organization, Inc.,* 957 F.2d 239, 244 (6th Cir.1992); *In the Matter of Xonics Imaging, Inc.,* 837 F.2d 763, 767 (7th Cir.1988). A creditor may overcome the presumption that late payments are

---

**2.** The parties have stipulated that 11 U.S.C. § 547(c)(2)(A) has been satisfied.

non-ordinary by showing that it was in the ordinary course of the parties' business to pay late. *In re Powerine Oil Co.*, 126 B.R. 790, 795 (9th Cir.B.A.P.1991); *In re Fred Hawes, supra* at 244–245; *In re Craig Oil Co., supra* at 1568.

32. In this case, the evidence shows that all payments by Braniff to Sundstrand during the preference period were outside the payment terms of "net 30 days" set forth on Sundstrand's invoices. Hence, all payments by Braniff to Sundstrand during the preference period were late and therefore presumptively non-ordinary. In reviewing the evidence, however, the court concludes that all payments by Braniff to Sundstrand before the preference period were also outside the payment terms of "net 30 days".

33. At trial Sundstrand contended that invoice numbers A92207, A92345, A93262 and A93575, in the total amount of $392,-088.64, were not paid outside the parties' ordinary course of business. To support this contention, Sundstrand attempted to argue that Braniff first obtained these four invoices by facsimile transmission on June 14, 1989, and that the invoices were therefore "re-issued" to Braniff on that date. Thus, according to Sundstrand, because these four invoices were paid by Braniff within approximately 36 days of June 14, 1989, the court should conclude that Braniff's $392,088.64 payment by check number 58690 was a transfer within the ordinary course of the parties' business.

34. Based on a review of the evidence as a whole the court concludes that it is just as likely that Braniff received invoice nos. A92207, A92345, A93262 and A93575 in the routine course of the parties' business, long before June 14, 1989. As stated above, the written issue date on the invoices is May 22, 1989, May 5, 1989, April 3, 1989 and March 27, 1989, respectively. All four of these invoices are addressed to Dalfort. The evidence shows that it was routine for invoices to Braniff to be sent to Dalfort and either paid for by Dalfort or forwarded to Braniff for payment. The testimony of Ms. Wyman indicated that at one time during Braniff's relationship with

Sundstrand, Dalfort and Braniff were affiliated companies, that they maintained offices in the same location, and that the two companies once shared physical facilities including a common mailroom. Braniff's accounts payable department in fact stamped invoice number A93575 as having been received in that department on June 7, 1989, not June 14, 1989, as argued by Sundstrand. Thus, on the issue of when the four invoices were received by Braniff, the evidence is at least equipoise and therefore Sundstrand cannot prove by a preponderance of the evidence that Braniff did not receive the four invoices near the date of their issuance as was the parties' routine practice.

35. Based on the evidence presented at trial, the court concludes that the degree of lateness in Braniff's payments to Sundstrand during the preference period is significant in connection with check no. 58690, in the amount of $392,088.64. Check no. 58690 paid invoice numbers A92207, A92345, A93262 and A93575, and did not clear Braniff's bank until 116, 109, 77 and 60 days after the date of these invoices, respectively. Thus, even taking into account that all Braniff's payments to Sundstrand were outside the written payments terms of "net 30 days", the court concludes that Braniff's delay in paying these four particular invoices is a significant factor in taking Braniff's $392,088.64 payment to Sundstrand out of the ordinary course of the parties' business for purposes of 11 U.S.C. § 547(c)(2)(B) and (C). *See In re Homes of Port Charlotte Florida, Inc., supra* at 491 ("Even though the payments prior to the preference period were generally later than the invoice terms, clearly, the dealings between the parties changed during the preference period").

2. *Unusual Debt Collection Efforts*

36. Unusual debt collection efforts by a creditor, such as a refusal to deliver new merchandise unless the debtor makes payment on outstanding invoices, can also constitute evidence from which the court can conclude that preference payments are outside the ordinary course of business. *In re Industrial Supply Corp., supra* 109

B.R. at 489, *aff'd*, 127 B.R. at 65. As set forth in the letter of July 18, 1989, from Cristy Tuazon of Sundstrand to Joseph Wibrew of Braniff (Braniff's Trial Exhibit 52), Sundstrand states, among other things, that "[d]ue to past payments on your account, we are unable to ship units to Aerospatiale. They have called us as to when they can expect units". As supported by the testimony of Ms. Wyman, and as noted by the court in *Braniff, Inc. v. GPA Group plc, etc. al. (In re Braniff, Inc.)*, 118 B.R. 819 (Bankr.M.D.Fla.1989), Braniff's transactions with Aerospatiale, whereby Braniff was procuring 50 firm and 50 option Airbus A–320 aircraft for its fleet, was very important to Braniff, and delays in delivery of the UFDRs and GPWCs from Sundstrand could cause delays in deliveries of the A–320s to Braniff. It is clear to the court that the July 18, 1989, letter from Ms. Tuazon was the "bomb shell" intended by Sundstrand to threaten Braniff with a cut off in shipments if Braniff did not pay all past due amounts to Sundstrand. The evidence presented in connection with Braniff's Trial Exhibit 62, further shows that check number 58690 in the amount of $392,088.64 was released to Sundstrand from Braniff's cash control department on July 18, 1989, the same date as Ms. Tuazon's "bomb shell" letter. This rather large check was released to Sundstrand at a time when Braniff was holding checks due to cash flow problems. Viewing the evidence as a whole, the court concludes that Sundstrand's unusual debt collection efforts in connection with check no. 58690 further show that transfer by Braniff was outside the parties' ordinary course of business.

37. The evidence also shows that in August 1989 Sundstrand again threatened to stop all shipments for Braniff to Aerospatiale if Braniff did not immediately come current on its $80,000 line of credit with Sundstrand. Check no. 65885 in the amount of $87,346.59 was released to Sundstrand by Braniff as a result of these threats by Sundstrand. The court concludes that this constitutes unusual debt collection efforts by Sundstrand to take the $87,346.59 payment by Braniff out of the parties' ordinary course of business.

### 3. *Other Circumstances*

38. During the preference period Sundstrand established a new account for Braniff and Braniff treated certain large invoices from Sundstrand (nos. A92207, A92345, A93262 and A93575) as part of Braniff's capital budget. This had not occurred before the preference period and is further evidence that payment of these invoices by Braniff was outside of the parties' ordinary course of business.

39. There was also testimony presented that during the preference period Braniff was forced to withhold checks after they were issued due to cash flow problems, including check nos. 58690, 61752 and 65885 to Sundstrand. This is additional evidence which supports the court's conclusion that the payments represented by check nos. 58690, 61752 and 65885 were transfers made by Braniff to Sundstrand outside of the parties' ordinary course of business for purposes of 11 U.S.C. § 547(c)(2)(B) and (C). *Braniff, Inc. v. Aircraft Tooling, Inc. (In re Braniff, Inc.)*, supra at 10; *In re Kroh Bros. Development Co.*, 115 B.R. 1011, 1020 (Bankr. W.D.Mo.1990); *In re Powerine Oil Co.*, 126 B.R. 790, 791 n. 4, 795 (9th Cir.B.A.P. 1991) (The holding of checks by a debtor during the preference period is a factor that a court may consider in determining whether such transfers are ordinary).

40. The court concludes that Sundstrand has failed to meet its burden on its ordinary course of business defense as to check nos. 58690 ($392,088.64), 61752 ($750.00) and 65885 ($87,346.59). The evidence shows that check no. 71101 ($375.00) was not held by Braniff, nor was it the subject of unusual debt collection efforts by Sundstrand. Check no. 71101 was therefore in the ordinary course of business.

### D. *Subsequent Advances For New Value*

41. The parties agree that during the preference period Sundstrand made subsequent advances to Braniff totaling $175,-851.59. The parties also agree that of this

amount $88,505.00 remained unpaid as of the petition date. The parties disagree, however, as to the amount of new value credit to be received by Sundstrand for purposes of the new value defense set forth at 11 U.S.C. § 547(c)(4). Braniff contends that Sundstrand should receive new value credit only for those invoices that remained unpaid as of the petition date. On the other hand, Sundstrand contends that it should receive new value credit for all subsequent advances made during the preference period, whether paid or unpaid as of the petition date. If Braniff's position is adopted, Sundstrand will receive new value credit against Braniff's preference claim in the amount of $88,505.00. Assuming that Braniff prevails on the solvency issue, this result would allow Braniff to recover $392,055.23, plus interest, from Sundstrand in this adversary proceeding. Alternatively, if Sundstrand's position is adopted, Sundstrand will receive new value credit against Braniff's preference claim in the amount of $175,851.59. Assuming that Braniff prevails on the solvency issue, this result would allow Braniff to recover $305,-083.64, plus interest, from Sundstrand in this adversary proceeding. At trial, Braniff presented evidence through its Trial Exhibit 6 to show the amount of new value to which it believes Sundstrand is entitled. Sundstrand, on the other hand, presented evidence through its Trial Exhibit 31 to show the amount of new value to which it believes it is entitled. For the reasons discussed below, the court adopts Braniff's position on the § 547(c)(4) issue.

### 1. Controlling Case Law In The Eleventh Circuit

42. Sundstrand alleges that it should receive new value credit in the amount of $175,851.59, not the $88,505.00 alleged by Braniff. The trial evidence shows that the difference between these two dollar amounts is created by Braniff check no. 65885 in the amount of $87,-346.59. From the trial evidence presented by both parties, the court concludes that check no. 65885 cleared Braniff's bank during the preference period and paid Sundstrand invoice nos. A95404 (in the amount of $48,444.00) and A95405 (in the amount of $38,902.59).

43. The court notes that Braniff's position on the new value issue is supported by controlling law in the Eleventh Circuit, while Sundstrand's is not. In *In re Jet Florida System, Inc.*, 841 F.2d 1082 (11th Cir.1988), the court of appeals considered an appeal by Charisma Investment Company, N.V. from the district court's affirmance of the bankruptcy court's finding that Charisma received $11,761.33 in avoidable preferential transfers from the debtor. In affirming the decision of the district court, the court of appeals set forth the following three requirements that a creditor must satisfy to prevail on a new value defense under 11 U.S.C. § 547(c)(4):

> This section [11 U.S.C. § 547(c)(4)] has generally been read to require: (1) that the creditor must have extended the new value after receiving the challenged payments, (2) that the new value must have been unsecured, and (3) that the new value must remain unpaid. *See e.g., In re Fulghum*, 45 B.R. at 119; *In re Keydata Corporation*, 37 B.R. 324, 328 (Bankr.D.Mass.1983); *In the Matter of Bishop*, 17 B.R. 180, 183 (Bankr.N.D.Ga. 1982).

*Jet Florida, supra* at 1083.

44. Thus, the court of appeals has plainly identified three requirements which must be satisfied before a creditor such as Sundstrand can prevail with a defense under 11 U.S.C. § 547(c)(4).[3] In adopting these three requirements, the court of appeals has followed the established majority rule represented by such cases as *In re Fulghum*, 45 B.R. 112 (Bankr.M.D.Tenn. 1984), *In re Keydata Corporation*, 37 B.R. 324, 328 (Bankr.D.Mass.1983); *In re Bishop*, 17 B.R. 180, 183 (Bankr.N.D.Ga.1982), and *In re New York City Shoes, Inc.*, 880 F.2d 679, 680 (3rd Cir.1989), among others.[4]

---

**3.** Adherence to the highest legal authority in one's own circuit cannot be lightly abandoned. *In re Kroh Brothers Development Co.*, 115 B.R. 1011, 1015, n. 2 (Bankr.W.D.Mo.1990).

**4.** *E.g., In re Prescott*, 805 F.2d 719 (7th Cir.1986); *In re Keydata Corporation*, 37 B.R. 324 (Bank. D.Mass.1983); *In re American International Airways, Inc.*, 56 B.R. 551 (Bankr.E.D.Pa.1986); *In*

All of these cases require that new value must remain unpaid in order for a creditor such as Sundstrand to state a defense under 11 U.S.C. § 547(c)(4).

### 2. *New Value Must Remain Unpaid As Of The Petition Date*

45. In "Defendant's Post–Trial Brief On Section 547(c)(4) Issues" ("Post–Trial Brief"), Sundstrand agrees that its subsequent advances to Braniff must remain unpaid in order for Sundstrand to receive new value credit under 11 U.S.C. § 547(c)(4). Post–Trial Brief, p. 2. However, Sundstrand contends "that because this Court has permitted Braniff to recover its payment on invoices A9–5404 and A9–5405, then, for the purpose of Section 547(c)(4), such invoices remain 'unpaid' ". Post–Trial Brief, p. 2.

46. The point that Sundstrand misses in making this argument is that the law requires new value to remain unpaid *as of the petition date*, not as of the date a bankruptcy court later adjudicates a preference action by the debtor. On this issue, the court is again persuaded by the established majority rule as articulated by the Third Circuit Court of Appeals in *New York City Shoes, supra,* wherein the court states:

> The three requirements of section 547(c)(4) are well established. First, the creditor must have received a transfer that is otherwise voidable as a preference under § 547(b). Second, *after* receiving the preferential transfer, the preferred creditor must advance "new value" to the debtor on an unsecured bias. Third, the debtor must not have fully compensated the creditor for the "new value" as of the date that it filed its bankruptcy petition. *See In re Almarc Manufacturing, Inc.,* 62 B.R. 684, 686 (Bankr.N.D.Ill.1986). If· a creditor satis-

fies these elements, .it is entitled to set off the amount of the "new value" which remains unpaid on the date of the petition against the amount which the creditor is required to return to the trustee on account of the preferential transfer it received. *Id.*

*New York City Shoes, Inc., supra* at 680; accord *In re Almarc Manufacturing, Inc.,* 62 B.R. 684, 686 (Bankr.N.D.Ill.1986); *In re American International Airways, Inc.,* 56 B.R. 551, 554–555 (Bankr.E.D.Pa.1986); *In re Vunovich,* 74 B.R. 629, 632 (Bankr. D.Kan.1987); *In re Jespersen,* 67 B.R. 415, 417 (Bankr.D.S.D.1986); *In re Energy Cooperative, Inc.,* 130 B.R. 781, 789 (N.D.Ill. 1991); *In re Ford,* 98 B.R. 669, 681 (Bankr. Vt.1989).

47. Thus, a majority of courts that have considered the issue have determined that a subsequent advance must remain unpaid by the debtor as of the petition date to qualify for new value credit under 11 U.S.C. § 547(c)(4). *See In re American International Airways, Inc., supra* at 554 (Noting that this is the majority rule). As the court will discuss below, this rule furthers the several policies underlying the preference provisions of the Bankruptcy Code.

### 3. *The Court Declines To Follow The Minority Position On The Paid New Value Issue*

48. Sundstrand relies primarily on the two recent decisions of *In re Check Reporting Services, Inc.,* 140 B.R. 425 (Bankr.W.D.Mich.1992) and *In re IRFM, Inc.,* 144 B.R. 886 (Bankr.C.D.Cal.1992) to support its contention that new value need not remain unpaid as of the petition date or as of the date a preference claim is adjudicated to qualify for new value credit under 11 U.S.C. § 547(c)(4). The court declines to follow this minority position.[5]

*re Formed Tubes, Inc.,* 46 B.R. 645 (Bankr. E.D.Mich.1985); *In re Quality Plastics, Inc.,* 41 B.R. 241 (Bankr.W.D.Mich.1984); *In re Almarc Manufacturing, Inc.,* 62 B.R. 684 (Bankr.N.D.Ill. 1986); *In re Jespersen,* 67 B.R. 415 (Bankr.D.S.D. 1986); *In re Vunovich,* 74 B.R. 629 (Bankr.D.Kan. 1987); *In re Amarex, Inc.,* 74 B.R. 378 (Bankr. W.D.Okla.1987); *In re Georgia Steel, Inc.,* 56 B.R.

509 (Bankr.M.D.Ga.1985); *In re Bishop,* 17 B.R. 180 (Bankr.N.D.Ga.1982); *In re Jet Florida System, supra; In re Fulghum, supra.*

**5.** The court notes that the rule it adopts in this action has been the established majority rule since well before *Check Reporting* and *IRFM* were decided in 1992.

49. As discussed above, controlling case law in this circuit, as well as a majority of courts, require that subsequent advances must remain unpaid as of the petition date to qualify as new value under 11 U.S.C. § 547(c)(4). *Jet Florida, supra; New York City Shoes, supra.* This rule is consistent with each of the several policies underlying the preference provisions of the Bankruptcy Code.

### 4. Policies Furthered By The Majority Position Adopted By The Court

50. The court of appeals has described the several policy objectives of 11 U.S.C. § 547(c)(4) as follows:

> The first objective is to encourage creditors to continue extending credit to financially troubled entities while discouraging a panic-stricken race to the courthouse. *See In re Gold Coast Seed Company,* 30 B.R. 551, 553 (Bankr.9th Cir. 1983); *In re Fulghum,* 45 B.R. at 119; *In re Philadelphia Light Supply Co.,* 33 B.R. 734, 739 (Bankr.E.D.Pa.1983). Another related objective of this section is to promote an equality of treatment among creditors (citations omitted). The subsequent advance exception promotes these general policy objectives "because its utility is limited to the extent to which the estate is enhanced by the creditor's subsequent advances during the preference period." 4 *Collier on Bankruptcy,* ¶ 547.12, at 547–49 n. 5 (15th ed. 1987); *see also* Countryman, *Voidable Preference,* 38 Van.L.Rev. at 785.
>
> Thus, courts have generally required a transfer which fits within the subsequent advance exception to provide the debtor with a material benefit. *In re Fulghum,* 45 B.R. at 120; *see also In re Quality Plastics,* 41 B.R. at 243. This focus upon whether a material benefit has been conferred has been explained in terms of insulating a preferential transfer to a particular creditor to the extent that the creditor thereafter replenishes the estate.

*Jet Florida, supra* at 1083–1084.

51. The rule adopted by the court will further each of these policies, while the minority rule advanced by Sundstrand focuses only on the first.

### a. Material Benefit And Enhancement Of The Estate

52. One of the requirements for a creditor to obtain new value credit under 11 U.S.C. § 547(c)(4) is that the subsequent advance for new value must provide the debtor with a material benefit, thereby enhancing the estate. *Jet Florida, supra* at 1084; *In re Fulghum, supra* at 120; *In re Quality Plastics, Inc., supra* at 243; and 4 *Collier on Bankruptcy* ¶ 547.12, at 547–49, n. 5 (15th ed. 1987) (New value "is limited to the extent to which the estate is enhanced by the creditor's subsequent advances during the preference period").

53. The trial evidence shows that after Braniff made a preferential transfer to Sundstrand in the amount of $392,088.64 on July 21, 1989, Sundstrand then advanced equipment to Braniff, as evidenced by invoice nos. A95404 and A95405, in the amount of $87,346.59. The parties agree that these two invoices were paid in full during the preference period by Braniff's check no. 65885 in the amount of $87,-346.59. Therefore, any material benefit which enhanced the estate by virtue of invoice nos. A95404 and A95405, was extinguished when Sundstrand was paid in full for those invoices. *See In re American International Airways, Inc., supra* at 554.

### b. Equality Of Treatment Among Creditors

54. One of the primary policy objectives furthered by the rule adopted by the court on the new value issue is that of equality of treatment among creditors. *See generally, Jet Florida, supra* at 1083; *In re Quality Plastics, Inc., supra* at 242; H.R.Rep. No. 595, 95th Cong., 1st Sess. 177–79, 372–74 (1978), U.S. Code Cong. & Admin. News 1978, p. 5787.

55. Under the rule adopted by the court in this case, Sundstrand will be given credit against Braniff's preference claim for all subsequent advances made by Sundstrand that actually enhanced the estate as of the petition date. Sundstrand is permitted to file a proof of claim against Braniff's estate for all invoices that remained unpaid

as of the petition date and to share equally in any distribution on that proof of claim with all other members of the general unsecured creditor class. As shown by Braniff's Trial Exhibit 63, Sundstrand has in fact filed such a proof of claim in the amount of $88,505.00. This result is fair and equitable and promotes the policy of equality of treatment among creditors. The court sees neither a windfall to Braniff nor a "grievous injustice" to Sundstrand from this result.

### c. Encouraging Creditors To Continue To Extend Credit To Financially Troubled Entities

56. Sundstrand argues that the rule adopted by the court on the new value issue will discourage creditors from extending credit to financially troubled entities. Based on the evidence presented at trial and a review of applicable case law, the court is unpersuaded by this argument.

57. To the extent a creditor such as Sundstrand gives new value to a financially troubled entity after receiving a preferential transfer, the creditor will receive new value credit for the subsequent advance if it remains unpaid as of the petition date. Thus, to the extent the estate is actually enhanced by the extension of credit, the creditor is protected. As for any amounts which remain unpaid as of the petition date, the creditor may file a proof of claim and share equally in any distribution on that proof of claim with other creditors of the same class.

58. Sundstrand relies on *Jet Florida* for the proposition that the sole objective of 11 U.S.C. § 547(c)(4) is to encourage creditors to extend credit to financially troubled entities. As discussed above, in addition to encouraging creditors to extend credit to troubled entities, § 547(c)(4) is also intended to (1) promote equality among creditors and (2) reward creditors who actually enhance the estate during the preference period. *Jet Florida, supra* at 1083–1084. Sundstrand ignores these two policy objectives and focuses exclusively on potential harm to creditors. As the court stated in *In re Ford:*

In determining whether a creditor extended "new value," the focus is not on the harm or detriment to the creditor, but rather the issue before the Court is whether there is an augmentation or material benefit to the debtor's estate. *Charisma Investment Company, N.V. v. Airport Systems, Inc. (In re Jet Florida System, Inc.),* 68 B.R. 596, 602 (S.D.Fla.1986) *aff'd per curiam Charisma Investment Company N.V. v. Airport Systems, Inc. (In re Jet Florida System, Inc.), supra* 841 F.2d 1082 (11th Cir.1988).

*In re Ford, supra* at 682.

### d. The Industrial Supply Case Does Not Address The Paid–Unpaid New Value Issue

59. At page four of its Post–Trial Brief, Sundstrand argues that the case of *In re Industrial Supply Corp., supra* 109 B.R. 484, *aff'd,* 961 F.2d 1582 (11th Cir.1992), applies the same new value rule advocated by Sundstrand in this action. A review of *Industrial Supply* shows that this argument is erroneous.

60. First, the analysis set forth at page 487 of *Industrial Supply* is based on "undisputed facts" agreed to by the parties before trial. In this case, the parties are not in agreement as to the proper payment history or the proper method for calculating new value.

61. Second, the "paid" versus "unpaid" new value issue was not raised in *Industrial Supply* and is not discussed in that decision. For these reasons, Sundstrand's reliance on *Industrial Supply* is misplaced.

### 5. *This Court Has Recently Applied Jet Florida In This Chapter 11 Proceeding*

62. In the adversary proceeding entitled *Braniff, Inc. v. Petro Source Corp.,* Adversary No. 91–336 (David T. Stosberg, J.), this court adopted the position on the new value issue now adopted by the court in this adversary proceeding. On December 8, 1992, the court issued an oral ruling from the bench in the *Petro Source* adversary stating that it would follow the *Jet*

*Florida* line of cases and would not permit Petro Source, the preference defendant, to receive new value credit for invoices that were paid as of the petition date. It would result in inconsistent rulings on the same issue, in the same chapter 11 case, in the same court, if the court now adopted a different rule in this adversary proceeding.

DONE and ORDERED.