**In re MASTERCRAFT GRAPHICS, INC., Debtor.**

**Marika TOLZ, Trustee, Plaintiff,**

**v.**

**SIGNAL CAPITAL CORP., Defendant.**

**Bankruptcy No. 91–23768–BKC–AJC.
Adv. No. 92–0682–BKC–AJC–A.**

United States Bankruptcy Court,
S.D. Florida.

Aug. 13, 1993.

Corali–Lopez–Castro, Miami, FL, for Signal Capitol.

Susan D. Lasky, Fort Lauderdale, FL, for trustee.

### MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

Mastercraft Graphics, Inc. (the debtor) filed a voluntary petition for relief under the provisions of Chapter 11 on October 17, 1991. The case was converted to a case under Chapter 7 by order entered on January 28, 1992, and Marika Tolz was appointed trustee. On July 14, 1992, the trustee commenced this adversary proceeding against Signal Capital Corporation (Signal) to recover certain alleged preferential transfers made within one year of the petition date. On January 11, 1993, a trial was held in Miami, Florida, and the matter was taken under advisement.

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F) (1988). The following shall constitute the Court's findings of fact and conclusions of law pursuant to Fed. R.Bankr.P. 7052.

The debtor was in the business of providing printing and related services. Between March 31, 1986, and April 11, 1988, the debtor entered into six separate agreements to lease printing equipment from Signal. The transactions between the parties were financing arrangements, although some of the documents used in the transactions characterized the arrangements as both leases and secured transactions. The debt owed by the debtor to Signal constituted 64% of the debtor's total indebtedness. The president of the debtor, Paul Seplaw (Seplaw), personally guaranteed the debtor's obligations to Signal.

The agreement dated March 31, 1986, was denoted as a "Master Equipment Lease Agreement" and was for a term of eight years. The payments required to be made under the agreement were as follows:

| Payments | 1 through 15 | $ 7,920.00 per month |
| Payments | 16 through 24 | 11,100.00 per month |
| Payments | 25 through 96 | 13,590.00 per month |

The second agreement was evidenced in part by a promissory note dated January 7, 1987, in the original principal sum of $43,-600.00. The note was to be repaid in equal monthly installments of $908.33 for a period of forty-eight months.

The third agreement dated May 8, 1987, was styled as a "Master Equipment Lease

Agreement" and provided for monthly payments as follows:

Payments 1 through 60    $  9,075.00
Payment 61                   460,000.00

The fourth agreement dated May 8, 1987, was styled as a lease agreement and provided for sixty monthly payments of $1,651.50.

The fifth agreement was evidenced by a promissory note dated April 11, 1988, in the original principal amount of $280,000.00 and was to be repaid in monthly installments as follows:

Payment  1              $ 4,900.00
Payments 2 through  7       500.00
Payments 8 through 12     5,768.00
Payments 13 through 84    5,572.00

The sixth agreement was evidenced by a promissory note dated April 11, 1988, in the original principal amount of $285,000.00 and was to be repaid in monthly installments as follows:

Payment  1              $ 4,900.00
Payments 2 through  7       500.00
Payments 8 through 12     5,800.00
Payments 13 through 84    5,671.00

Payments under the six agreements were due on different days of each month in different amounts.

The debtor became delinquent in its obligation to Signal, and on October 12, 1990, Signal filed a civil action against the debtor in the Circuit Court of Broward County, Florida. Signal sought to repossess the printing equipment and sought judgment for damages due to the debtor's detention of the property.

The printing equipment was essential to the debtor's ability to continue to operate its printing business. On December 14, 1990, a settlement was reached between Signal and the debtor. The settlement agreement provided, in relevant part, as follows:

1. Mastercraft and Perfect are the lessees under certain Master Equipment Lease Agreements ("Leases") and Security Agreements which are attached to the complaint in the above captioned case.

2. Mastercraft and Perfect are in default under the Leases and Security Agreements for failure to make monthly payments.

3. Mastercraft and Perfect have no defenses of law or fact, or counterclaims or offsets of any kind, to Signal's complaint for replevin as of the date of this agreement.

4. Mastercraft and Perfect agree to resume making the regular monthly payment due under the Leases and Security Agreements on December 15, 1990 and all successive payments *on the 15th of each month.*

5. As of November 29, 1990, Mastercraft and Perfect owe Signal, in past due monthly payments, interest and late charges, the total amount of *$381,503.30,* plus costs and attorneys' fees in the amount of $2,416.27 for a total past due indebtedness (the "arrearage") of *$383,919.57.* Interest continues to accrue on the past due monthly payments as set forth in the Leases and Security Agreements. . . .

6. In addition to making regular monthly payments under the Leases and Security Agreements, Mastercraft and Perfect agree to pay off the Arrearage in $10,000.00 monthly payments. Such monthly payments shall continue until the Arrearage has been paid. Mastercraft and Perfect may prepay the arrearage at any time.

7. As lease schedules come to normal end of term, payments attributable to said Lease would be applied to the Arrearage. Accordingly, Mastercraft and Perfect will pay *$48,078.21* per month to Signal until such time as all lease payments, Arrearage, late charges and any other amounts owed pursuant to the Leases and Security Agreements are paid in full. . . .

8. All payments under this agreement shall be payable to the order of Signal Capital Corporation and shall be deliv-

ered to Signal Capital Corporation, 20 Ladd Street, Portsmouth, NH 03801, on the *15th* of each month.

9. Time is of the essence on all of these payments required by this agreement. Mastercraft's and Perfect's payment must be *received* by 5:00 p.m. on the 15th day of every month. There will be no grace periods.

. . . .

12. Mastercraft and Perfect agree that Signal (i) may obtain a writ of replevin covering the Property, *with 24 business hours notice* to Mastercraft and Perfect, and (ii) may file the stipulation for entry of final judgment described in paragraph 14 below, with *24 business hours notice* to Mastercraft and Perfect, in the event of any of the following:

a. Mastercraft or Perfect fail to make the monthly payments as required under this *agreement;*

b. Mastercraft or Perfect deny Signal access to the Property;

c. Mastercraft or Perfect fail to maintain the Property in *good and marketable condition; as long as Mastercraft and Perfect comply with paragraphs 12 (loss and damage) and 13 (insurance) in the Leases, Signal will not declare damage to equipment due to vandalism, fire, etc., an event of default.*

d. Mastercraft or Perfect fail to maintain insurance covering the Property.

e. For so long as Mastercraft and Perfect make all required payments under this agreement and comply with all the conditions listed, Signal shall forbear from delivering the writ of replevin to the Sheriff of Broward County, Florida for execution and shall forbear from delivering the stipulation for entry of final judgment to the court.

. . . .

14. As attorney for Mastercraft and Perfect, you will execute and return to me the enclosed stipulation for entry of final judgment, fully executed by your clients.

Plaintiff's Ex. 8.

Pursuant to the settlement agreement, the debtor made ten payments by company checks in the amount of $48,078.21 per month. These checks were honored by the debtor's bank as follows:

| Check No. | Date |
|---|---|
| 3933 | December 4, 1990 |
| 4087 | January 27, 1991 |
| 4201 | February 20, 1991 |
| 4281 | March 19, 1991 |
| 4412 | April 16, 1991 |
| 4526 | May 21, 1991 |
| 4638 | June 21, 1991 |
| 4749 | July 30, 1991 |
| 4871 | August 23, 1991 |
| 4984 | September 20, 1991 |

The total amount of the payments was $480,782.10. These payments were made within one year of the debtor's bankruptcy petition.

The trustee argues that all the payments listed above are preferential payments that benefited an insider, Seplaw, and may be recovered under 11 U.S.C. §§ 547 and 550 (1988). Signal does not vigorously challenge the debtor's argument that the payments constitute preferences, but strenuously argues that all payments were made in the ordinary course of business and, therefore, are protected pursuant to 11 U.S.C. § 547(c)(2) (1988).

### DISCUSSION

11 U.S.C. § 547(b) provides as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before date of the filing of the

petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (1988).

■ The evidence in this case establishes all the elements of a preference that benefited an insider. The payments were transfers of property of the estate to a creditor on account of an antecedent debt. The trustee's expert witness testified, after examining the debtor's financial records, that the debtor was insolvent on each date the transfers were made. The trustee testified that liquidation of the estate resulted in gross proceeds of $155,000.00. Plaintiff's Ex. 13 contains a financial statement reflecting liabilities of over $2.7 million as of December 31, 1990. Under these circumstances, Signal received more than it would have received under a Chapter 7 case. Finally, since the payments were guaranteed by the debtor's president, who is an insider, the trustee may recover preferential transfers made within one year of the petition date. 11 U.S.C. § 101(31)(B)(i) & (ii) (1988); *Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186 (7th Cir.1989).

The affirmative defense provided for by 11 U.S.C. § 547(c) (1988) provides as follows:

(c) The trustee may not avoid under this section a transfer—

. . . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms. . . .

11 U.S.C. § 547(c)(2) (1988).

One of the goals of the preference section is to deter " 'the race of diligence' of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section—that of equality of distribution." *Union Bank v. Wolas*, 112 S.Ct. 527, 533 (1991) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 177–78 (1978), *reprinted in* 1978 U.S.C.C.A.N. 6137–78). The legislative history of section 547(c)(2) is brief and provides that the purpose of section 547(c)(2) "is to leave undisturbed normal financial relations, because [such an exception] does not detract from the general policy of the preference section to discourage unusual actions by either the debtor or his creditors during the debtor's slide into bankruptcy." *Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1565 (11th Cir.1986) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 373–74 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6329). *See also* 4 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 547.10 (15th ed. 1992).

■ A creditor asserting the affirmative defense under 11 U.S.C. § 547(c)(2) has the burden of proof to establish the applicability of the section. 11 U.S.C. § 547(g) (1988). *See First Software Corp. v. Curtis Mfg. Co. (In re First Software Corp.)*, 81 B.R. 211, 212 (Bankr.D.Mass.1988); 4 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 547.21[5] (15th ed. 1990). The creditor must establish that the transfers were payments (1) on a debt incurred in the ordinary course of business, (2) made in the ordinary course of business of the debtor and creditor, and (3) made according to ordinary business terms. 11 U.S.C. § 547(c)(2) (1988). The creditor must prove each of the three elements of section 547(c)(2) by a preponderance of the evidence. *Logan v. Basic Distribution Corp. (In re Fred Hawes Org.)*, 957 F.2d 239, 242 (6th Cir. 1992); *J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 891 F.2d 66 (3d Cir.1989); *WJM, Inc. v. Massachusetts Dept. of Pub. Welfare,*

840 F.2d 996 (1st Cir.1988). *But see Lovett v. St. Johnsbury Trucking,* 931 F.2d 494 (8th Cir.1991); *Jones v. United Sav. & Loan Ass'n (In re U.S.A. Inns),* 151 B.R. 492, 498 (W.D.Ark.1993); *Equipment Co. of America v. Production Supply Co. (In re Equipment Co. of America),* 135 B.R. 169 (Bankr.S.D.Fla.1991).

Signal must first prove that the debt was incurred in the ordinary course of business of the debtor and the creditor. *See* 11 U.S.C. § 547(c)(2)(A) (1988). The trustee concedes this element.

■ The second element Signal must prove is that the transfers to Signal were made in the ordinary course of business or financial affairs of the debtor and Signal. *See* 11 U.S.C. § 547(c)(2)(B) (1988). In determining whether a payment is made in the ordinary course of business, the facts and circumstances surrounding the payments must be considered. *Lovett v. St. Johnsbury Trucking,* 931 F.2d 494 (8th Cir.1991). Factors which militate against a finding of ordinary course of business include untimeliness of the payment (*Gold Coast Seed Co. v. Beachner Seed Co. (In re Gold Coast Seed Co.),* 24 B.R. 595 (Bankr. 9th Cir.1982); *Ewald Bros. v. Kraft, Inc. (In re Ewald Bros.),* 45 B.R. 52 (Bankr.D.Minn.1984)), change in method of payment by cashiers check rather than corporate check, (*Marathon Oil Co. v. Faltau (In re Craig Oil Co.),* 785 F.2d 1563 (11th Cir.1986)), and payments made pursuant to unusual economic pressure and unusual debt collection or payment practices (*Xtra Inc. v. Seawinds Ltd. (In re Seawinds Ltd.),* 91 B.R. 88 (N.D.Cal.1988), *aff'd,* 888 F.2d 640 (9th Cir.1989)).

The pivotal question to determine is whether the payments made to Signal were in response to unusual debt collection or payment practices. In *Marathon Oil,* the Eleventh Circuit Court of Appeals stated that "547(c)(2) should protect those payments which do not result from 'unusual' debt collection or payment practices. To the extent an otherwise 'normal' payment occurs in response to such practices, it is without the scope of § 547(c)(2)." *Marathon Oil Co.,* 785 F.2d at 1566.

■ The conduct of the parties involved must be considered to determine what is ordinary with respect to the parties. *Howison v. Adkin Plumbing & Heating Supply Co. (In re Websco, Inc.),* 92 B.R. 1 (Bankr. D.Me.1988). Signal places great reliance on those cases which hold that even if the transactions between the creditor and debtor are irregular, they may still be considered ordinary for purposes of 547(c)(2) if the transactions were consistent with the course of dealing between the particular parties. *Yurika Foods Corp. v. United Parcel Serv. (In re Yurika Foods Corp.,* 888 F.2d 42 (6th Cir.1989); *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.),* 872 F.2d 739 (6th Cir.1989); *Lovett v. St. Johnsbury Trucking,* 931 F.2d 494 (8th Cir.1991). Signal also emphasizes those cases which have construed payments under restructured debt agreements to be in the ordinary course of business. *First Software Corp. v. Micro Educ. Corp. of America,* 103 B.R. 359 (D.Mass.1988); *Armstrong v. John Deere Co. (In re Gilbertson),* 90 B.R. 1006 (Bankr.D.N.D.1988); *In re Magic Circle Energy Corp.,* 64 B.R. 269 (Bankr.W.D.Okla.1986).

■ Prior to the settlement agreement, the debtor made separate monthly payments to Signal by company check on each of the six separate agreements. During this time, Signal possessed security interests and other rights which could be invoked to terminate the contract and repossess the printing equipment in the event of default. These rights were granted by the agreements and were enforceable under state law.

On October 12, 1990, Signal filed an action against the debtor and alleged that the debtor was delinquent for ten, and in some cases, eleven months. The parties entered into a settlement agreement on December 14, 1990. After the settlement agreement was effectuated, the debtor made ten payments in the agreed sum of $48,078.21. The payments were made by corporate check and sent by Federal Express to Signal. The settlement agreement specifically provided that $10,000.00 of each payment

was to be applied to arrearages and the balance was to be considered the regular monthly payments due under the various agreements. The settlement agreement provided that no grace period exists. One check did not clear, but at the debtor's request, it was redeposited and ultimately cleared. Some of the other payments were late, but Signal took no action to enforce the breach.

Cathleen Ash, a senior portfolio analyst for Signal, testified on behalf of Signal. She was responsible for determining the feasibility of workouts and preparing necessary documents for their implementation. She handles around 100 accounts at a time. She testified she received the debtor's account in February 1990 when it was six or seven months in arrears. Ash referred the debtor's account to legal counsel when she became convinced that further efforts on her part would be futile. She characterized the settlement agreement between the debtor and Signal as a "restructured agreement" and offered her opinion that all the payments made pursuant to the settlement were made in the ordinary course of business between the debtor and Signal. Ash also testified that she had imposed workout terms similar to those used in this case on other creditors over the past several years. She offered her opinion that in the equipment financing industry it is ordinary and usual to restructure accounts in the manner in which Signal restructured the debtor's account.

All the payments made by the debtor to Signal were made under a settlement agreement of a civil action whereby, among other things, the debtor was required to acknowledge in writing that it had no defenses to a replevin action and was required to "execute ... [a] stipulation for entry of final judgment." Plaintiff's Ex. 8. If the debtor failed to make a required payment by 5:00 p.m. on the due date, Signal could exercise the option of having a replevin order entered within twenty-four business hours.

■ The purpose of preference law is to prohibit accelerated creditor demand in anticipation of financial collapse that would "diminish the size of the estate available to all creditors and result in grossly unequal distribution of assets." Ken Magid, Note, 6 *Wolas v. Union Bank* 21 Cal.Bankr.J. 71, 73 (1993) (citing H.R.Rep. No. 595 95th Cong., 1st Sess., 177–78 (1977)). Signal's activities in this case are precisely what preference law is designed to correct.

Payments made pursuant to creditor pressure similar to circumstances in this case, have been determined to be outside the ordinary course of business. *See Gull Air, Inc. v. Beech Acceptance Corp. (In re Gull Air, Inc.)*, 82 B.R. 1 (Bankr.D.Mass. 1988) (payments made in response to civil action not consistent with prior transactions between parties and, therefore, not in ordinary course of business); *Xtra Inc. v. Seawinds Ltd. (In re Seawinds Ltd.)*, 91 B.R. 88, *aff'd*, 888 F.2d 640 (9th Cir.1989) (payments made in response to lease termination notice and increased lease payment held not in the ordinary course of business); *J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 891 F.2d 66 (3d Cir.1989) (payments made pursuant to agreement to file notice of intention to file lien as "something to fall back on if he reneged" held not in the ordinary course of business). *See also Carrier Corp. v. Mid Corp. (In re Daikin Miami Overseas, Inc.)*, 65 B.R. 396 (S.D.Fla.1986); *Glenshaw Glass Co. v. Ontario Grape Growers Mktg. Bd. (In re Keystone Foods, Inc.)*, 145 B.R. 502 (Bankr.W.D.Pa.1992); *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 127 B.R. 722 (Bankr.W.D.N.Y.1991); *Singer Prod. Co. v. First Am. Bank (In re Singer Prod. Co.)*, 102 B.R. 912 (Bankr.E.D.N.Y. 1989); *Jet Fla., Inc. v. American Airlines, Inc. (In re Jet Fla., Inc.)*, 73 B.R. 552 (Bankr.S.D.Fla.1987).

Signal attempts to characterize its settlement agreement with the debtor as a usual and customary restructuring agreement similar to the agreements mentioned in cases such as *Armstrong v. John Deere Co. (In re Gilbertson)*, 90 B.R. 1006 (Bankr.D.N.D.1988) and *In re Magic Circle Energy Corp.*, 64 B.R. 269 (Bankr. W.D.Okla.1986). Significantly, in both cases, new debt instruments were executed and the indebtedness was truly restruc-

tured. In addition, no civil action to collect the debt was pending at the time of the restructuring and none of the threatening circumstances which exist here were present in the cited cases. What occurred here is not appropriately characterized as a restructuring, but rather is a compromise of a pending civil suit for a writ of replevin and judgment.

■ The payments made in *Marathon Oil* were described by the Court as made pursuant to "unusual debt collection and payment practices." *Marathon Oil,* 785 F.2d at 1566. The creditor pressure in this case is significantly more unusual and intense than the pressure described in *Marathon Oil.* In *Marathon Oil,* the Court stated that "whenever the bankruptcy court receives evidence of unusual collection efforts it must consider whether the debtor's payment was in fact in response to these efforts." *Id.* at 1566. The facts in this case lead to no other conclusion than the payments were made in response to Signal's unusual collection efforts.[1]

Therefore, none of the payments made by the debtor to Signal were made in the ordinary course of business and, the trustee is granted a judgment against Signal for the sum of $480,782.10.

IT IS SO ORDERED.

---

1. The fact that Signal claims it is not unusual to treat delinquent accounts in this fashion misses the point. "Usual" in this context refers to comparing the current method of payment with the method of payment before the collection suit was filed. *See Gull Air, Inc. v. Beech Acceptance Corp. (In re Gull Air, Inc.),* 82 B.R. 1 (Bankr. D.Mass 1988).