In the Matter of ANDERSON–SMITH & ASSOCIATES, INC., Debtor.

ANDERSON–SMITH & ASSOCIATES, INC., Plaintiff,

v.

XYPLEX, INC., Defendant.

Bankruptcy No. 94–82821.
Adv. No. 95–80086.

United States Bankruptcy Court,
N.D. Alabama,
Northern Division.

Nov. 17, 1995.

Philip Geddes, Decatur, AL, for plaintiff.

Tazwell Shepard, Huntsville, AL, for defendant.

## MEMORANDUM OPINION

JACK CADDELL, Bankruptcy Judge.

This matter is before the Court on a complaint filed by the debtor-in-possession, Anderson–Smith & Associates, Inc. (hereinafter "Debtor"), seeking a determination by this Court that certain transfers of property made by the Debtor to Xyplex, Inc. (hereinafter "Xyplex"), constituted preferential transfers within the meaning of section 547(b) of the Bankruptcy Code. Xyplex denied the allegations set forth in the complaint and raised the ordinary course of business and contemporaneous exchange affirmative defenses provided in section 547(c) of the Code. The trial in this matter was held on the 21st day of September, 1995. Upon due consideration of the pleadings, documentary and testimonial evidence, and the relevant case law, this Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. On December 16, 1994, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Debtor is an engineering corporation specializing in the manufacturing and installation of computer and network systems. Xyplex, a supplier of network system components, is a creditor in this bankruptcy case.

2. The 90 day period during which a preference could be effected pursuant to section 547 of the Bankruptcy Code commenced on September 16, 1994.

3. At all times during the preference period the liabilities of Debtor exceeded its assets. C.A. Anderson, president of the Debtor (hereinafter "Anderson"), testified that as of August 1994 Debtor's liabilities exceeded its assets by approximately $350,000.00 and by approximately $400,000.00 to $425,000.00 on the date Debtor filed its petition. Debtor first consulted an attorney regarding bankruptcy during the fall of 1994.

4. The relationship between Debtor and Xyplex began approximately one year before the Debtor filed its Chapter 11 petition. Debtor alleges that payment for the first order, which occurred in September and November of 1994, was a preferential transfer.

5. In December of 1993, Xyplex's district manager, Tom Domzal (hereinafter "Domzal"), approached and informed Anderson that he needed a local dealer to service a government project that would commence in early 1994. Anderson informed Domzal that he was uncomfortable placing such a large order without having a buyer to whom Debtor could immediately resell the product. Domzal advised Anderson that Debtor could place the order without paying the invoice until the government contract was procured in February of 1994 even though the contract required purchasers to remit all payments within thirty days of invoice.

6. Pursuant to these negotiations, Debtor entered into the Xyplex Value–Added Reseller Agreement (hereinafter the "agreement"), with Xyplex on or about December 20, 1993. Under the terms of the agreement, Xyplex delivered $36,034.00 in goods to Debtor represented by Anderson–Smith invoice number 1265. Debtor accepted delivery of said goods to accommodate Domzal's request that Debtor stock the inventory in anticipation of the February 1994 government contract. Pursuant to the terms of the agreement, Debtor was required to remit payment to Xyplex within thirty days after the date of the invoice.

7. The government contract was not awarded to Debtor, and upon learning of this event Xyplex began to pressure Debtor to pay invoice 1265. Anderson testified that Domzal continued to instruct Debtor to withhold payment until it was able to resell the network components. However, according to Anderson, Xyplex continued to repeatedly request payment during the interim.

8. On August 17, 1994, Debtor "responded to repeated past due notices from Xyplex"[1] by informing Xyplex that it would not pay invoice 1265 until the products were actually resold. Xyplex's financial manager, Kimberly Chi (hereinafter "Chi"), testified that it is standard procedure for Xyplex to contact customers that fall behind on their payments to determine when payment will be forthcoming. She further testified that only five to ten percent of Xyplex's customers are more than ninety days late paying their invoices.

9. On June 24, 1994, Debtor placed an order with Xyplex in the amount of $25,156.00 for equipment Debtor needed to fulfill a separate government contract which it was awarded. The transaction was represented by invoice number 1663. Although Xyplex was already pressuring Debtor to pay invoice number 1265, the new equipment was delivered to Debtor on June 30, 1994.

10. Upon selling a portion of the goods in inventory representing invoice numbers 1265 and 1663, Debtor mailed Xyplex check number 6762 (hereinafter "check #1"), dated September 14, 1994, in the amount of $19,211.00. Check #1 cleared Debtor's account on October 26, 1994. Anderson testified that Debtor remitted payment to Xyplex upon selling the inventory because Xyplex was repeatedly requesting payment.

11. Thereafter, Debtor sold additional products representing invoice numbers 1265 and 1663. In payment thereof, Debtor remitted check number 6937 (hereinafter "check #2"), dated November 1, 1994, in the amount of $17,434.76. Check #2 was returned to Debtor for insufficient funds. Anderson testified that sufficient funds had been in Debtor's account to cover check #2, but a garnishment placed on the account caused the check to be returned. Immediately upon learning of the returned check, Debtor contacted Xyplex and informed it that Debtor would be sending a replacement check (hereinafter "check #3"), numbered 230 and dated November 11, 1994, in the same amount. Check #3 cleared Debtor's account on November 16, 1994. During this time, Debtor returned the balance of the inventory represented by invoice 1265 to Xyplex upon determining that it would not be able to sell the remaining components.

12. On October 31, 1994, Debtor placed another order with Xyplex in the amount of $98,224.30, represented by invoice number 1888. On November 7, 1994, Debtor and Xyplex discussed the possibility of Debtor assigning the proceeds from Debtor's customer, Southern Company, to Xyplex as payment for invoice 1888 in light of the Debtor's financial insecurity and the size of the order. Instead, Anderson testified that he agreed to personally guarantee the order. The order was delivered on November 9, 1994. To insure that the personal obligation was satisfied, Anderson, upon receiving payment from Southern Company, endorsed over to Xyplex the draft from Southern Company (hereinafter "check #4"), in the amount of $135,297.34, on November 18, 1994. Anderson testified that he believed that it was prudent to endorse the check to Xyplex in light of his personal guarantee.

13. Anderson transferred the Southern Company check to Xyplex with the understanding that the balance in excess of the invoice was to be remitted to Debtor. Instead, Xyplex remitted approximately $29,000.00 to Debtor on November 21, 1994 and retained a difference of approximately $7,800.00. Chi testified that Xyplex inadvertently charged Debtor sales tax and remitted the $7,800.00 to the Alabama taxing authorities. Chi testified that Xyplex can obtain a refund from the taxing authorities for the funds mistakenly withheld, but Xyplex is claiming a right to setoff due to Debtor's account balance being approximately $9,000.00 in arrears for pre-petition orders and for stopping payment on a C.O.D. check payment.

14. On November 30, 1994, Debtor placed an order represented by invoice 1924 with Xyplex in the amount of $8,193.88, payment being made by check number 1759 (hereinafter "check #5"). Check #5 was dated January 20, 1995, and cleared Debtor's account on January 26, 1995. According to the com-

1. *See* Defendant's Proposed Findings of Facts and Conclusions of Law, p. 1–2.

plaint, payment of invoice number 1924 also constituted a preferential payment.

15. On April 7, 1995, Debtor placed an order for $10,136.54, represented by invoice number 2032, with Xyplex. Chi testified that as early as December of 1994, Xyplex began to require cash on delivery for all orders placed by Debtor. The terms of the invoice allowed Xyplex to make such demands. Thus, Debtor was required to pay cash on delivery for invoice 2032 before Xyplex would deliver the order. Debtor paid invoice 2032 by check, and thereafter, stopped payment on the check. Anderson testified that Debtor stopped payment on the check due to Xyplex's refusal to return money owed for the funds mistakenly withheld and paid to the Alabama taxing authorities.

### *DISCUSSION*

■ Section 547(b) of the Bankruptcy Code (hereinafter the "Code") makes voidable preferential transfers of a debtor's property occurring within 90 days of the filing date of the debtor's bankruptcy petition. 11 U.S.C. § 574(b). *In re Health Science Products, Inc.*, 183 B.R. 903, 918 (Bankr.N.D.Ala. 1995). A preferential transfer is a transfer of the debtor's interest in property (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before the transfer was made; (3) made while the debtor was insolvent; (4) made on or within 90 days before the date of the filing of the petition; (5) that enables such creditor to receive more than such creditor would receive if (a) the case were a case under Chapter 7 of this title or if (b) the transfer had not been made. 11 U.S.C. § 547(b); *Union Bank v. Wolas*, 502 U.S. 151, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991); *In re Kemp Pacific Fisheries, Inc.*, 16 F.3d 313 (9th Cir.1994). The underlying purpose of preference law is the desire to insure an equal distribution of available assets to all creditors. *In re Martin*, 184 B.R. 985, 990 (Bankr.M.D.Ala.1995).

■ The plaintiff has the burden of proving that the pre-petition transfer is avoidable because it constitutes a preferential transfer under section 547(b) of the Code. *Id.* at 990. Thereafter, the burden of proof shifts to the defendant, against whom recovery or avoidance is sought, to prove that it is entitled to one of the affirmative defenses to preferential transfers as set forth in section 547(c) of the Code. 11 U.S.C. § 547(g); *In re Martin*, 184 B.R. at 994; *In re Mastercraft Graphics, Inc.*, 157 B.R. 914, 918 (Bankr.S.D.Fla.1993).

■ Payment of invoice 1924 did not constitute an avoidable preferential transfer where payment did not occur until after the bankruptcy petition was filed. Debtor neglected to demonstrate to this Court how a transfer occurring over a month after the filing date on Debtor's petition constitutes an avoidable preferential transfer under section 547(b) of the Code where said section plainly requires said transfer to occur pre-petition. Thus, the Court finds that as a matter of law that the transfer is not an avoidable preference under section 547(b) of the Code.

■ However, the Court finds that Debtor has satisfied its burden of proof on the elements of 11 U.S.C. § 547(b) to prove the existence of a preferential transfer with regard to payment of invoice numbers 1265 and 1663. A debtor is presumed to be insolvent during the 90 day preference period. *In re Grove Peacock Plaza, Ltd.*, 142 B.R. 506 (Bankr.S.D.Fla.1992). In this instance, the testimony regarding Debtor's insolvency during the 90 day preference period was uncontroverted. There is no dispute that a transfer of an interest of Debtor in property was made to Xyplex, and that this transfer was on account of an antecedent debt incurred in December of 1993 and June of 1994. Thus, the Debtor has established by a preponderance of the evidence that a transfer was made and that said transfer benefited Xyplex; that said transfer was made on account of an antecedent debt while the Debtor was insolvent, and that it enabled the creditor to receive more than it would have if the case had been one under Chapter 7 or if the transfer had not occurred.

■ Further, the transfers were made within the 90 day preference period. We begin with the premise that the rule of law in this circuit is that for purposes of the 90 day preference period the "date of transfer is not the date the check is delivered, but the date

the check is honored by the paying bank." *Ellenberg v. Mercer (In re Home Company)*, 108 B.R. 357, 359 (Bankr.N.D.Ga.1989); *Whittaker v. Citra Trading Corp. (In re Int'l. Diamond Exchange Jewelers, Inc.)* 177 B.R. 265 (Bankr.S.D.Ohio 1995); *Gepfrich v. Gepfrich (In re Gepfrich)*, 118 B.R. 135, 138 (Bankr.S.D.Fla.1990); *Sims Office Supply, Inc. v. Ka–D–Ka, Inc. (In re Sims Office Supply, Inc.)*, 94 B.R. 744 (Bankr.M.D.Fla. 1988); *Tidwell v. Atlanta Gas Light Co. (In re Georgia Steel, Inc.)*, 38 B.R. 829 (Bankr. M.D.Ga.1984); *Harris v. Harbin Lumber Co. (In re Ellison)*, 31 B.R. 545 (Bankr.M.D.Ga. 1983). The Debtor paid invoice numbers 1265 and 1663 by checks # 1, # 2 and # 3. Since check # 1 was honored on October 26, 1994, the Court finds as a matter of law that said transfer was within the 90–day preference period.

■ Check # 2 was not honored due to the garnishment placed upon Debtor's account. Where a check is not honored, the transfer does not take place until a replacement check is honored. *St. Louis Globe Democrat, Inc. v. Missouri General Ins. Agency*, 99 B.R. 946 (Bankr.E.D.Mo.1989). Thus, the transfer with regard to check # 2 did not take place until it was replaced with an honored check. Since the replacement check was honored on November 16, 1994, the Court finds as a matter of law that the transfer was within the 90–day preference period.

■■ Xyplex argues that the payments were made in the "ordinary course of business", an exception to the preferential transfer provision. 11 U.S.C. § 547(c)(2). As aforesaid, once the preference is established by the trustee the burden shifts to the defendant to show that it is entitled to the safe haven of an exception. The Court shall interpret the ordinary course of business exception to the trustee's preference avoidance powers narrowly. *Braniff, Inc. v. Sund-*

*strand Data Control, Inc. (In re Braniff, Inc.)*, 154 B.R. 773 (Bankr.M.D.Fla.1993).

■ In order to except a preferential transfer from the trustee's avoiding power as one made during the ordinary course of business, the creditor must demonstrate that said payment was incurred by and made during the ordinary course of the debtor's and creditor's business and that said transfer was made according to ordinary business terms.[2] Debtor's debt to Xyplex was incurred to facilitate Debtor's acquisition of various computer contracts. It is certainly within the ordinary course of business for an engineering corporation specializing in the manufacturing and installation of computer and network systems to order supplies that enables it to manufacture computer and network systems on credit. Thus, the Court must determine whether the transfers in question were made within the ordinary course of business between Debtor and Xyplex and whether they were made according to ordinary business terms.

■ The Bankruptcy Code does not define the phrase "ordinary course of business", but generally, the courts have focused on the prior conduct of the parties, the common industry practice, and particularly, whether the payment resulted from any unusual action by either the debtor or the creditor. COLLIER ON BANKRUPTCY 547 (15th Ed.1993). In deciding whether a preferential transfer was made in the ordinary course of business, the Court must consider the facts and circumstances surrounding the transfer. *Tolz v. Signal Capital Corp. (In re Mastercraft Graphics, Inc.)*, 157 B.R. 914 (Bankr. S.D.Fla.1993).

In *In re Craig Oil Company*, 785 F.2d 1563, 1564 (11th Cir.1986), the Eleventh Circuit addressed the issue of whether a payment was made in the ordinary course of business. The court stated the following concerning section 547(c)(2):

2. Section 547(c) of the Bankruptcy Code provides that:
   (c) The trustee may not avoid under this section a transfer—
   (2) to the extent that such transfer was—
   (A) in payment of a debt incurred by the debtor in the ordinary course of business or

financial affairs of the debtor and the transferee;
(B) made in the ordinary course or financial affairs of the debtor and the transferee; and
(C) made according to ordinary business terms;

It seems clear ... that § 547(c)(2) should protect those payments which do not result from "unusual" debt collection or payment practices. To the extent an otherwise normal payment occurs in response to such practices, it is without the scope of § 547(c)(2). Thus, whenever the bankruptcy court receives evidence of unusual collection efforts, it must consider whether the debtor's payment was in fact a response to those efforts.

With regard to the payment of invoice numbers 1265 and 1663 by checks # 1 and # 3, the Court finds that said payments were not made in the ordinary course of business of Debtor and Xyplex. Xyplex's district manager, Tom Domzal, pressured Debtor into accepting the initial shipment. Anderson testified that he informed Domzal that he was not comfortable placing such an order without a firm buyer, but Domzal insisted that he needed a local dealer to service a government project that would commence in two months. Domzal instructed Debtor to disregard the payment terms requiring payment within thirty days of invoice. After Debtor was unable to obtain the government project, Xyplex began to press for payment of the items covered by invoice 1265.

During said time invoice 1663 was ordered and delivered on June 30, 1994. In August of that year, Debtor informed Xyplex that it would not remit payment for invoice numbers 1265 and 1663 until the inventory was resold by Debtor. Thereafter, Debtor remitted payment to Xyplex upon selling the inventory to terminate Xyplex's repeated requests for payment. These payments cannot be said to have been made in the ordinary course of business between Debtor and Xyplex nor can they be said to have been made according to ordinary business terms. The Court is convinced that the unusual nature in which Debtor was urged to accept the first shipment was not in the parameters of the parties' ordinary course of business and the subsequent repeated requests for payment on both invoices constituted unusual debt collection and payment practices.

■ Another circumstance which demonstrates that the payment of invoice numbers 1265 and 1663 was not made in the ordinary course of business is the fact that the payment of both invoices was substantially later than the required thirty day terms of the invoice. Late payments are presumptively not made in the ordinary course of business within the meaning of section 547(c)(2). *In re Braniff, Inc.*, 154 B.R. at 780. In the case of *In re Braniff, Inc.*, the court held that the evidence demonstrated that the transfers made by the debtor within the preference period were all late where said payments were all made outside the written invoice terms of net 30 days. *Id.* In the instant case, invoice 1265 was ordered in December of 1993 while invoice 1663 was placed in June of 1994. Therefore, the initial payment by check # 1, which cleared Debtor's account on October 26, 1994, was approximately ten months late with respect to invoice 1265 and approximately four months late with respect to invoice 1663. Further, payment by replacement check # 3, which cleared Debtor's account on November 16, 1994, was even later.

■ The Court is further concerned by the fact that the second transfer represented a payment for the replacement of a check that had been dishonored. Checks dishonored for insufficient funds generally do not constitute payments made within the ordinary course of business. *Pressman v. Rodemich (In re So Good Potato Chip Co.)*, 137 B.R. 330 (Bankr.E.D.Mo.1992); *Sprowl v. Miami Valley Broadcasting Corp. (In re Federated Marketing, Inc.)*, 123 B.R. 265 (Bankr.S.D.Ohio 1991); *Mann v. Missouri General Ins. Agency, Inc. (In re St. Louis Globe Democrat, Inc.)*, 99 B.R. 946 (Bankr. E.D.Mo.1989). In the case of *In re Barefoot*, 952 F.2d 795, 800 (4th Cir.1991), the court held that Congress did not "intend a bad check and subsequent payment to make it good to be viewed as in the ordinary course of affairs between two parties or made according to ordinary business terms." This Court agrees and finds that the replacement check did not constitute a transfer made within the ordinary course of business.

Thus in summary, with regard to invoices numbers 1265 and 1663, the Court finds as follows:

(1) the circumstances surrounding the initial arrangement concerning invoice 1265 wherein Debtor was pressured into taking deliver of goods in anticipation of being awarded a government contract was not in the ordinary course of business for either party;

(2) there were unusual debt collection efforts and pressure by Xyplex to make Debtor pay for both invoices;

(3) the invoices required payment within thirty days of issuance, but Debtor stated that it could not and would not pay for same until it was able to sell the goods; and

(4) the check issued to pay for invoice 1663 bounced and Debtor ultimately paid for same by issuing a replacement check.

■ Now the Court turns to the transfer in payment of invoice 1888. Invoice 1888 was paid by Anderson's endorsement of the Southern Company check to Xyplex in the amount of $135,297.34. The Debtor has established by a preponderance of the evidence that a transfer was made and that said transfer benefited the Xyplex; that said transfer was made on account of an antecedent debt incurred on or about November 9, 1994 and paid on November 18, 1994, while the Debtor was insolvent, enabling the creditor to receive more than it would have if the case had been one under Chapter 7 or if the transfer had not been made. Further, the transfer occurred within the 90 day preference period.

■ The check was delivered to Xyplex on November 18, 1994. There is no evidence regarding the date on which the check was honored. As aforesaid, the date of transfer is not the date the check is delivered, but the date the check is honored by the paying bank for purposes of the 90 day preference period under section 547(b). However, the Court finds that where the date of delivery was approximately one month before the petition date, the Court can conclude that the date of honor occurred before the filing date absent evidence to the contrary. The check was sent by express mail to Chi on November 18,

1994. Xyplex remitted a portion of the balance owed Debtor on November 21, 1994. It can be assumed that Xyplex would not have remitted said balance until the check on Southern Company was honored. Moreover, neither party offered any evidence to indicate that said payment was not honored before the petition date. Accordingly, on its face, this transfer appears to be a preferential transfer pursuant to section 547(b) of the Bankruptcy Code.

■ Xyplex contends that if the transfer is preferential, it is protected by the "ordinary course of business exception" found in 11 U.S.C. § 547(c)(2). In the alternative, Xyplex contends that if the transfers is found to be preferential and not in the ordinary course of business, it is protected by the "contemporaneous exchange for new value" exception found in 11 U.S.C. § 547(c)(1).

■ At the outset, the Court finds that this transaction cannot be said to have been made in the ordinary course of business where Xyplex required Anderson to personally guarantee said debt or in the alternative required Debtor to provide an assignment of proceeds before shipping invoice 1888.[3] However, the Court finds that Xyplex has satisfied its burden of proof on the elements of 11 U.S.C. § 547(c)(1).

■ The contemporaneous exchange for new value safe haven provided by section 547(c)(1) of the Code is an affirmative defense which the objecting party to the preference has the burden of establishing. *Unsecured Creditors Comm. v. Airport Aviation Servs., Inc. (In re Arrow Air, Inc.)*, 940 F.2d 1463 (11th Cir.1991). A preferential transfer is protected by the "contemporaneous exchange for new value exception" found in 11 U.S.C. § 547(c)(1) where (1) the transferee extends new value to the debtor in exchange for the transfer, (2) the exchange was intended by the parties to be contemporaneous, and (3) the exchange was in fact substantially contemporaneous. *Id.* at 1465.

---

**3.** Chi testified that it is Xyplex's normal custom to require its customers to personally guarantee unusually large orders or provide an assignment of proceeds. However, self-serving testimony is not determinative of the ordinary course of dealing between the parties. *See In re Ideal Sec. Hardware Corp.*, 186 B.R. 237 (Bankr.E.D.Tenn. 1995).

■ Ordinarily, an extension of credit, no matter how brief, does not constitute a contemporaneous exchange. *Wasserman v. Village Assoc. (In re Freestate Management Serv., Inc.)*, 153 B.R. 972, 984 (Bankr.D.Md. 1993) (holding that "[t]he exception for a contemporaneous exchange does not ordinarily apply to credit transactions.") (citing *In re Barefoot*, 952 F.2d 795, 800 (4th Cir. 1991)). However, the extension of new credit, in certain circumstances, may constitute new value. In the case of *In re Arrow Air, Inc.*, at 1465, the Eleventh Circuit provided that:

[A] transfer from debtor to creditor [in] payment of a preexisting debt does not automatically preclude the transfer from also being a contemporaneous exchange for new value. See *In re Jet Florida*, 861 F.2d 1555, 1558 (11th Cir.1988). And, under appropriate circumstances, the new value exchanged for the transfer or payment may take the form of new credit. See *id.*; 11 U.S.C.A. § 547(a)(2) ("new value means money or money's worth in goods, services, or new credit"). Therefore, it is not impossible, as a matter of law, that an extension of new credit ... could have constituted new value.

■ The purpose of the contemporaneous exchange exception is to protect transactions that do not result in the diminution of the bankruptcy estate. *In re Martin*, 184 B.R. at 993; *In re Cocolat*, 176 B.R. 540 (Bankr. N.D.Cal.1995). In the instant case, the transfer did not result in a depletion of Debtor's estate. *In re Quade*, 108 B.R. 674 (Bankr.N.D.Iowa 1989) (providing that in determining whether new value was exchanged courts can consider whether there was a depletion of the bankruptcy estate). After negotiating the terms of payment, Xyplex extended Debtor new credit, in the amount of $98,224.30 for supplies which were delivered to Debtor. *See In re Arrow Air, Inc.*, 940 F.2d at 1463 (holding that to establish that its extension of new credit constituted new value, the creditor had to prove that for each dollar transfer from debtor to creditor, the creditor extended the same amount of dollar for dollar credit to debtor). Therefore, the first element of section 547(c)(1) has been satisfied.

The second element that Xyplex must establish is the intent of the parties at the time of the exchange. Xyplex must prove that the parties intended for the transaction to be a contemporaneous exchange. *Friedman v. Ginsburg (In re David Jones Builder, Inc.)*, 129 B.R. 682, 694 (Bankr.S.D.Fla.1991); *Ferrer v. Prusa Distributing Corp. (In re Kiddy Toys, Inc.)*, 178 B.R. 928, 935 (Bankr. D.P.R.1994) (providing that "[t]here must be some manifest desire by the parties that the exchange contemporaneously grant money or money's worth in new credit, goods, services, or property to the debtor").

Before the debt was incurred, the parties discussed altering Debtor's method of payment for invoice 1888. It is unclear whether Xyplex agreed to accept Anderson's personal guarantee for said invoice or whether the parties agreed to an assignment of proceeds. Chi testified that Xyplex usually requires customers to personally guarantee the debt or provide an assignment of proceeds for unusually large orders or where Xyplex is concerned with the viability of its customer. Debtor placed the order represented by invoice 1888 on or about October 31, 1994. On November 7, 1994, Debtor and Xyplex discussed Xyplex's requirement that either Debtor assign the proceeds from the order to Xyplex or provide a personal guarantee by Anderson before Xyplex would ship the order. Anderson testified that he agreed to personally guarantee invoice 1888 in lieu of an assignment of proceeds by Debtor. However, in Debtor's response to the Court's request for post-trial briefs, Debtor referred to the transaction as an assignment. In Xyplex's proposed findings of fact, Xyplex stated that "at the debtor's suggestion, the debtor verbally assigned the payment from a customer to Xyplex."[4] Thereafter, in its post-trial brief, Xyplex stated that it required Debtor's principal to personally guarantee invoice 1888. The Court notes that neither party proffered documentary evidence to substantiate the personal guarantee or the agreement to assign proceeds.

4. *See* Defendant's Proposed Findings of Fact and Conclusions of Law at p. 2.

Despite the parties apparent confusion regarding the transaction, it is clear that the parties intended for the transaction to be a contemporaneous exchange. Xyplex delivered the goods represented by invoice 1888 on November 11, 1994 only upon Debtor's assurance of payment, either in the form of a personal guarantee or assignment of proceeds, which had never before been required.

■ With respect to the third element of section 547(c)(1), the Court finds that Xyplex satisfied its burden of proof. A transaction can be substantially contemporaneous even where there is some separation between the events of the extension of new value and the transfer by the debtor. *In re Kiddy Toys, Inc.*, 178 B.R. at 936. The Court finds that the exchange between the parties was functionally simultaneous despite the nine day delay in the extension of new credit and the payment. Thus, Xyplex has satisfied its burden of proof under section 547(c)(1). The transfer in payment of invoice 1888 was a substantially contemporaneous exchange.

■ As to Xyplex's claim for setoff, the Court finds that Xyplex has satisfied its burden of proof under section 553 of the Bankruptcy Code to the extent such claim is for money owed on pre-petition orders. Section 553(a) of the Bankruptcy Code preserves a creditor's right of setoff where it exists under applicable non-bankruptcy law. *In re Patterson*, 967 F.2d 505 (11th Cir.1992); *In re Orlinski*, 140 B.R. 600 (Bankr.S.D.Ga. 1991). In order to establish a claim for setoff pursuant to section 553, the creditor must demonstrate that: (1) the debt owed by creditor to debtor arose prior to commencement of the bankruptcy case; (2) the claim of creditor against debtor arose prior to commencement of the bankruptcy case; and (3) the debt and claim are mutual or reciprocal obligations. *In re Ruiz*, 146 B.R. 877 (Bankr.S.D.Fla.1992). Thus, before Xyplex is entitled to setoff a debt against an amount owed to the Debtor, Xyplex must establish that both the debt and claim arose prior to the Debtor's petition date and that the claim and debt arose out of mutual obligations.

■ To the extent Xyplex is claiming a right to setoff for Debtor's stopping payment on a post-petition C.O.D. check payment, Xyplex's claim fails to satisfy the second prong of section 553 of the Bankruptcy Code. *In re Reed*, 179 B.R. 353 (Bankr.S.D.Ga.1995) (providing that both sets of obligations must arise prior to the petition date for section 553 to be applicable).

With regard to Xyplex's claim for a right to setoff for Debtor's failure to pay orders placed pre-petition, the Court finds that section 553 will preserve Xyplex's right of setoff against Debtor. In the instant case, there is no dispute that Debtor's claim against Xyplex for money mistakenly paid to the Alabama taxing authorities arose pre-petition while Xyplex's claim against Debtor for its failure to pay pre-petition orders also arose pre-petition. Therefore, the first two elements of section 553 have been satisfied. That leaves as the only element in question whether the debt and claim are mutual obligations.

■ For a debt and claim to be mutual obligations, they must be asserted against the same entities; they need not "arise out of the same transaction". *Anthem Life Ins. v. Izaguirre (In re Izaguirre)*, 166 B.R. 484, 491 (Bankr.N.D.Ga.1994); *Southeast Bank v. Grant (In re Apex Int'l. Management Servs., Inc.)*, 155 B.R. 591, 593 (Bankr.M.D.Fla.1993) (providing that "[s]ection 553 does not mandate that the debt and claim be of identical character or that they arise from the same transaction"). In the case of *In re Izaguirre*, 166 B.R. at 491, the Court held that:

[In] a bankruptcy case, the availability of setoff turns on whether the claims of the creditor and the debtor both arose pre-petition ... The requirement of mutuality in the exercise of a right of setoff is another example of the effect of closing a debtor's books as of the filing of the petition.

Accordingly, in order to prove that mutuality exists Xyplex must simply demonstrate that something is owed by both sides. *See In re Apex, Int'l. Management Servs., Inc.* 155 B.R. at 593. In the instant case, there is no dispute that Xyplex has a claim against Debtor for money owed on pre-petition orders. Further, there is no dispute that Xyplex mistakenly withheld approximately $7,800.00 from Debtor on invoice 1888.

Therefore, Xyplex is entitled to a right to setoff to the extent that such claim is based upon Xyplex's claim for money owed prepetition.

Alternatively, Xyplex's right of setoff no longer exists if the Alabama taxing authorities remain in possession of the funds mistakenly paid by Xyplex. In that instance, Debtor is entitled to obtain a refund upon its own behalf from the Alabama taxing authorities.

An Order in accordance with this opinion will be entered.

### ORDER

In conformity with and pursuant to the memorandum opinion of the Court contemporaneously entered herewith and for reasons set forth therein,

It is ORDERED, ADJUDGED AND DECREED that judgment be entered in favor of the plaintiff/debtor, Anderson–Smith & Associates, Inc. (hereinafter "Debtor"), and against the defendant, Xyplex, Inc. (hereinafter "Xyplex"), with respect to the payments made on September 14, 1994 and November 11, 1994 in the total amount of $36,645.76.

It is also ORDERED, ADJUDGED AND DECREED that judgment be entered in favor of Xyplex, and against Debtor with respect to the payment made on January 20, 1995 in the amount of $11,439.64 and the payment made on November 18, 1994 for invoice 1888 in the amount of $98,224.30.

It is further ORDERED, ADJUDGED AND DECREED that Xyplex is entitled to setoff $7,800.00, the amount mistakenly withheld and paid to the Alabama taxing authorities against debt owed by Debtor for prepetition orders unless the taxing authorities remain in possession of said funds. If the tax funds remain in the possession of the taxing authorities, the Debtor shall be entitled to obtain a direct refund from the taxing authorities and Xyplex's right of setoff shall be extinguished.

Done and Ordered.